115 T.C. No. 42


UNITED STATES TAX COURT


JAMES W. AND LAURA L. KEITH, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 11426-98.                    Filed December 28, 2000.


        Prior to and during the years in issue, GIA, a
proprietorship owned by P wife, sold residential real
property by means of contracts for deed.  Under these
agreements, the buyers obtained possession; assumed
responsibility for taxes, insurance, and maintenance;
and became obligated to make monthly payments, with
interest, of the purchase price.   A warranty deed
would be delivered to the buyers by GIA only upon full
payment, and any default by the buyers prior thereto
would render the contracts null and void, with GIA
retaining all amounts paid as liquidated damages.

        In accounting for these transactions, Ps reported
the gain attributable to the contracts for deed in the
year in which full payment was received and title
transferred.  Only interest payments were included in
income for tax purposes until such time.  GIA also
depreciated the subject properties during the term of
each contract.

Held: Each contract for deed effected a completed sale for tax purposes in the year of execution, and income attributable to such disposition must be recognized and reported for that taxable year.

Held, further, the net operating loss carryovers claimed by Ps must be adjusted to take into account income which should have been reported in years preceding those at issue, for contracts entered during such prior periods.

Held, further, Baertschi v. Commissioner, 49 T.C. 289 (1967), revd. 412 F.2d 494 (6th Cir. 1969), will no longer be followed.

William J. White, for petitioners.

Nancy E. Hooten and Mark S. Mesler, for respondent.


OPINION


NIMS, Judge: Respondent determined the following deficiencies and penalties with respect to petitioners' Federal income taxes for the taxable years 1993, 1994, and 1995:

| Taxable Year | Income Tax Deficiency | Penalty Sec. 6662(a) |
| --- | --- | --- |
| 1993 | $74,925.00 | $14,985 |
| 1994 | 127,304.00 | 25,461 |
| 1995 | 106,261.54 | 21,252 |

After concessions, the issues remaining for decision are:

(1) The proper method of accounting for, and timing of recognition of gain attributable to, sales of property by means of contracts for deed; and

(2) the reduction of net operating loss carryovers from years preceding the years in issue to reflect income attributable to contracts for deed executed in those prior years.

Additionally, the parties have agreed that a third issue, the availability of depreciation deductions for properties subject to such contracts for deed, is dependent upon and will be resolved by our decision regarding petitioners' accounting method. The parties have stipulated the amounts to be allowed as depreciation deductions in the event of a ruling either for petitioners or for respondent.

Unless otherwise indicated, all section references are to sections of the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## Background

This case was submitted fully stipulated pursuant to Rule 122, and the facts are so found. The stipulations of the parties, with accompanying exhibits, are incorporated herein by this reference. Petitioners resided in Moultrie, Georgia, during each of the years in issue and at the time their petition was filed in this case.

Formation of Greenville Insurance Agency (GIA)

Petitioner James W. Keith is a radiologist, and petitioner Laura L. Keith is a dentist. Mrs. Keith is also the owner of a

proprietorship known as Greenville Insurance Agency (GIA). Mrs. Keith established the business in 1983 on the advice of her father, J.D. Latzak, as a vehicle to create potential tax savings. GIA was formed primarily to sell insurance, to purchase real estate for resale or rent, and to broker mortgages. Since its genesis, GIA has been run by Mr. Latzak who, because of large judgment creditors, could not conduct business or hold assets in his name. Although neither of the Keiths possesses an insurance license or has experience in real estate transactions, Mr. Latzak is a licensed insurance agent and an experienced broker. We previously addressed the treatment of insurance commissions and mortgage placement fees earned incident to GIA's operations for years 1984 through 1988 in Latzak v. Commissioner, T.C. Memo. 1994-416. We now focus on the reporting of income attributable to the company's sales of real property.

GIA's Real Estate Transactions

During the years at issue, GIA was in the business of selling, financing, and renting residential real property. The sales were effected by means of contracts for deed. The record reflects 18 such contracts entered into between 1989 and 1995, 12 of which were executed in the 1993 to 1995 period presently before the Court. The following is representative of these agreements:

CONTRACT FOR DEED

GEORGIA, MERIWETHER COUNTY

This agreement entered into by the seller and the buyer(s).  The seller hereby agrees to convey to the buyer(s) fee simple title to a certain property described on Exhibit "A" to this contract, at which time all of the conditions of the sale described below are met by the buyer.

SELLER:   Greenville Insurance Agency, a proprietorship, which is registered and domiciled in Meriwether County, Ga., maintaining an office open to the public at 109 Court Square, Greenville, Georgia 30222.

BUYER(S): _____
          _____
          _____

SELLING PRICE: _____ DOWN PAYMENT _____

BALANCE of $_____ to be evidenced by a promissory note plus interest at ____% interest payable in ___ monthly installments of $_____ per month, starting _____ and ending _____.

SPECIAL STIPULATIONS TO THE CONDITIONAL SALE:

(1)  The buyer(s) shall pay the prorated [year of execution] property taxes, and all future property taxes promptly when due.

(2)  The buyer(s) shall not permit the general condition of the property to deteriorate in value any futher [sic] than its delivered condition.

(3)  The buyer(s) shall perform any and all required maintenance on the property.

(4)  The buyer(s) shall assume all liabilities as if they had fee simple title.

(5)  The property is to be used as a primary single family residence for the buyer(s), and for no other purpose.

(6)   The buyer may not transfer or assign their [sic]
      rights or interest in this contract.

(6a) Fire Insurance in the amount of $_____ from a
      company approved by the Seller must be kept in
      force at all times, seller named as loss payee,
      until all terms are met by buyer.

(7)   Payment of the monthly installments of $_____
      are required to be tendered to the seller at its
      offices stated above or other place so designated
      by the seller or its assigns, and payable in
      United States Currency, on or before the due date.
      Any payment accepted more than ten (10) days
      beyond the due date will require an additional
      charge of 10% of the amount payable, and the
      acceptance of same will not modify or novate any
      other terms and conditions and will not act as a
      waiver of the sellers [sic] right to declare the
      contract in default and null and void and of no
      effect.

The seller agrees to convey to the buyer(s), a Warranty
Deed, free of any leins [sic] and encumbrances within
ten (10) days after all of the terms and conditions of
this agreement are met by the buyer(s).

Should the buyer(s) elect to acelerate [sic] this
agreement, then the terms and conditions of the
promissory note executed contemporaneously with this
agreement by the buyer(s) would determine the amount to
be tendered by the buyer(s) for the acceleration in
order to prematurely obtain a warranty deed.

Should the buyer(s) default or breach or not meet any
of the conditions of the terms herein specified, then
this contract and the note attached evidenced by this
contract will be immediately declared NULL & VOID, and
no futher [sic] benefits or equities would be accrued
to the buyer(s), except that the buyer(s) would be
liable for any monies unpaid under the terms and
conditions of the contract to the date that the
contract was declared null and void.

It is understood and agreed by the Buyer(s) and the
Seller that the $_____ ernest [sic] money down
payment, and the monthly installments and other charges
tendered by the buyer(s) from inception, and any

improvements to the property made by or on the behalf of the buyer(s) during the life of this contract, if forfeited by the buyer(s) as a result of default or breach of the contract, is a fair value for the liquidated damages incurred by the seller as a result of said breach or default.

No warranties as to the condition or usability of the property are either expressed or implied by the seller.

It is herein disclosed to the buyer(s) that the subject property may presently have existing debt being serviced by the seller, and that future debt (not to exceed the amount payable under this contract) may be incepted by the seller.[1]

The conditions of sale, as well as the provisions related to default, voidability, and liquidated damages, were substantially identical in all material respects in each of the contracts. Printed descriptions or handwritten notations indicate that the subject property of most of the agreements was a residence. A small percentage of the contracts may have been for land alone. The majority of the contracts were for terms of between 240 and 300 months and specified interest at a rate of 11 to 18 percent. The sales prices ranged from a low of less than $3,000 to a high of $40,000. The total gain represented by the contracts,

---

[1] With respect to this final paragraph, we note that neither party has referenced its existence or discussed its intended operation. Our own research has similarly yielded no insight into the precise meaning of such a provision or its potential impact on the buyer-seller relationship. Hence, since the parties apparently regard it as insignificant boilerplate, we shall do likewise and shall give it no further consideration.

calculated as the difference between the sales price and GIA's basis, was $58,373, $62,517, and $11,500 for agreements executed in 1993, 1994, and 1995, respectively.

GIA's Accounting and Reporting

With their 1993, 1994, and 1995 Federal income tax returns, petitioners included Schedules C, Profit or Loss From Business, with respect to GIA. On each such Schedule C, petitioners indicated GIA's accounting method by checking the box labeled "Accrual". A like designation was made on Schedules C filed with returns for the preceding years 1984 through 1992.

As regards accounting for the above-described real estate transactions in particular, the methodology generally utilized by petitioners has been stipulated by the parties. During the term of a contract for deed, petitioners would report as income the interest received on the promissory note entered into in conjunction with the contract. The portion of any payment allocable to principal would be treated as a deposit on the purchase and would be recorded as a liability on the books of the company. If a property were repossessed prior to completion of the contract, this deposit would be applied first to repairs and maintenance, and any remaining amount would be reported as miscellaneous income. The properties would also be depreciated by GIA during the payment period.

Upon full payment of the contract price, petitioners would recognize income on the disposition of the property. Gain on the sale would be computed by reducing the total sale price by petitioners' adjusted basis in the property.

## Discussion

### I. Contentions of the Parties

Petitioners contend that their method of accounting for and recognizing gain attributable to the contracts for deed is appropriate and clearly reflects income. According to petitioners, the contracts are mere voidable, executory agreements and as such do not effect a closed and completed sale in the year signed. Hence, in petitioners' view, there is no disposition of the properties for tax purposes and no consequent realization of gain until final payment is received and title transferred.

Conversely, respondent asserts that petitioners' method of accounting for sales under the subject contracts for deed is improper and fails to clearly reflect income. Respondent avers that each instrument produced a completed sale in the year of execution, as the benefits and burdens of ownership were transferred from petitioners to the buyer at that time. Respondent, characterizing petitioners as accrual method taxpayers, therefore concludes that no grounds exist for deferring recognition of gain on these completed transactions.

In addition, respondent argues that petitioners' incorrect method of accounting resulted in inflated losses in prior years such that the net operating loss carryovers to the years at issue should be reduced accordingly.

## II.  Method of Accounting and Recognition of Gain

### A.  Existence of Gain--Completed Sale

As a general rule, the Internal Revenue Code imposes a Federal tax on the taxable income of every individual.  See sec. 1.  Section 61(a) specifies that gross income for purposes of calculating such taxable income means "all income from whatever source derived".  Expressly encompassed within this broad pronouncement are "Gains derived from dealings in property". Sec. 61(a)(3).  Section 1001(a) then defines such gains as the amount realized "from the sale or other disposition of property", less the adjusted basis.  Accordingly, section 1001(a) indicates that gross income within the meaning of section 61(a) does not arise until property is considered sold or otherwise disposed of for Federal tax purposes.

Case law then sets forth the standard for determining when a sale is complete for tax purposes.  With respect to real property, a sale and transfer of ownership is complete upon the earlier of the passage of legal title or the practical assumption of the benefits and burdens of ownership.  See Major Realty Corp. & Subs. v. Commissioner, 749 F.2d 1483, 1486 (11th Cir. 1985),

affg. in part and revg. in part T.C. Memo. 1981-361; Dettmers v. Commissioner, 430 F.2d 1019, 1023 (6th Cir. 1970), affg. Estate of Johnston v. Commissioner, 51 T.C. 290 (1968); Baird v. Commissioner, 68 T.C. 115, 124 (1977).  This test reaffirms the longstanding principle, evidenced by the following early statement, that transfer of legal title is not a prerequisite for a completed sale:  "A closed transaction for tax purposes results from a contract of sale which is absolute and unconditional on the part of the seller to deliver to the buyer a deed upon payment of the consideration and by which the purchaser secures immediate possession and exercises all the rights of ownership." Commissioner v. Union Pac. R.R. Co., 86 F.2d 637, 639 (2d Cir. 1936), affg. 32 B.T.A. 383 (1935).

In determining whether passage either of title or of benefits and burdens has occurred, we look to State law.  It is State law that creates, and governs the nature of, interests in property, with Federal law then controlling the manner in which such interests are taxed.  See United States v. National Bank of Commerce, 472 U.S. 713, 722 (1985).  Here, execution of the contracts for deed was not accompanied by a transfer of legal title, so we must decide whether these instruments were sufficient under State law to confer upon the purchaser the benefits and burdens of ownership.  This inquiry is a practical one to be resolved by examining all of the surrounding facts and

circumstances.  See <u>Clodfelter v. Commissioner</u>, 426 F.2d 1391, 1393 (9th Cir. 1970), affg. 48 T.C. 694 (1967); <u>Baird v. Commissioner</u>, <u>supra</u> at 124.  As all contracts at issue appear to involve Georgia properties and to have been executed in Georgia, the relevant State law is supplied by the statutes and courts of that jurisdiction.

Among the factors which this and other courts have cited as indicative of the benefits and burdens of ownership are:  A right to possession; an obligation to pay taxes, assessments, and charges against the property; a responsibility for insuring the property; a duty to maintain the property; a right to improve the property without the seller's consent; a bearing of the risk of loss; and a right to obtain legal title at any time by paying the balance of the full purchase price.  See <u>Goldberg v. Commissioner</u>, T.C. Memo. 1997-74; see also <u>Major Realty Corp. v. Commissioner</u>, <u>supra</u> at 1487; <u>Grodt & McKay Realty, Inc. v. Commissioner</u>, 77 T.C. 1221, 1237-1238 (1981); <u>Musgrave v. Commissioner</u>, T.C. Memo. 2000-285; <u>Berger v. Commissioner</u>, T.C. Memo. 1996-76; <u>Spyglass Partners v. Commissioner</u>, T.C. Memo. 1995-452.  When a buyer, by virtue of such incidents, would be considered to have obtained equitable ownership under State law, a sale will generally be deemed completed for Federal tax purposes.  See <u>Baird v. Commissioner</u>, <u>supra</u> at 126; <u>Berger v. Commissioner</u>, <u>supra</u>; <u>Spyglass Partners v. Commissioner</u>, <u>supra</u>.

In the case at bar, we observe that the contracts for deed gave the buyers possession of the property during the agreement term (evidenced by the mandate to use the property as a residence). The contracts also required purchasers to pay property taxes from the date of execution, to keep fire insurance in force during the payment term, to perform maintenance and prevent deterioration, and to assume all liabilities as if they held fee simple title. Moreover, the instruments allowed buyers to accelerate the agreement and "prematurely obtain a warranty deed" by tendering the full amount owing under the related promissory note. Therefore, given these significant accoutrements of ownership, we turn to whether Georgia courts would construe an instrument so designating rights and obligations as a transfer of equitable ownership to the buyer.

In <u>Chilivis v. Tumlin Woods Realty Associates, Inc.</u>, 297 S.E.2d 4 (Ga. 1982), the Supreme Court of Georgia interpreted a contract analogous to those at issue here. In that case, an "Agreement for Deed" was executed by the parties. <u>Id.</u> at 5-6. According to its terms, a deed was placed in escrow to be delivered to the buyer upon completion of all payments called for in the accompanying promissory note. See <u>id.</u> at 6. The instrument specifically recited:

> "Seller and Buyer acknowledge and agree that this
> Agreement is not a mortgage or security deed to secure
> a loan made to Buyer by Seller, that this is an
> agreement to convey the Property to Buyer upon the

completion of the terms and provisions of this
Agreement * * * , that this is not a loan secured by
the Property and that no title in and to the Property
has passed to Buyer or will pass to Buyer until Buyer
fulfills and complies with each and every term and
provision hereof." [Id.]

The buyer was given immediate possession of the property and was responsible for taxes, maintenance, and insurance thereon. See id. Upon a default by the buyer, the seller's remedy was either to rescind the transaction or to exercise a power of sale over the property. See id. The buyer would not be liable for any deficiency in the event of such a sale. See id.

Faced with these facts, the court decided that the "Agreement for Deed" was "for all practical purposes no different from a bond for title", an instrument formerly used in Georgia real estate law in connection with sales of land. Id. at 7-8. The court further noted that prior case law had said of a bond for title:

"In the sale of land on credit where the vendor retains
title, he has not the absolute estate, but is a trustee
holding the title only as security. For many purposes
the transaction may be treated in equity as though the
vendor had made a deed to the vendee and the latter had
thereupon given a common-law mortgage to secure the
purchase-money." [Id. (quoting Lytle v. Scottish Am.
Mortgage Co., 50 S.E. 402, 406 (Ga. 1905)).]

Accordingly, the court then concluded with respect to the instrument before it as follows: "In practicality, it is no different than if * * * [the seller] had delivered a warranty deed to * * * [the buyer] and accepted a deed to secure debt in

return. The agreement created an equitable interest in * * * [the buyer] and a security interest in * * * [the seller]." Id. at 8.

The Court of Appeals of Georgia subsequently relied on Chilivis v. Tumlin Woods Realty Associates, Inc., supra, in interpreting a similar agreement in Tucker Fed. Sav. & Loan Association v. Alford, 311 S.E.2d 229 (Ga. Ct. App. 1983). The appellate case likewise involved a land sale contract under which the seller agreed to deliver a warranty deed upon full payment (or the assumption by the buyers of two outstanding mortgages on the property). See id. at 230. Again the instrument recited that no title passed upon execution of the agreement, but the buyers took possession and control of the premises. See id. The court first opined that "The transaction clearly granted * * * [the buyers] all the benefits and responsibilities of ownership." Id. On that basis, the conclusion ultimately reached was that "The contract of sale, of course, did not vest legal title in * * * [the buyers], but it did give them an equitable interest and rights of ownership." Id. at 231.

Given the foregoing, we conclude that Georgia courts would similarly construe the contracts for deed at issue here to pass equitable ownership to the purchasers and to leave GIA essentially with a security interest. In addition, we note that certain statements made by petitioners on brief are not

inconsistent with the notion that security concerns may in fact have motivated the transactional form chosen: "GIA sells real property to low-income families in Western Georgia near Columbus. Because these families are poor and have little or no credit history the properties are sold using a 'Contract for Deed'". Hence, we hold that these instruments upon their execution effected a completed sale for Federal tax purposes. Petitioners' reliance on Hambrick v. Bedsole, 91 S.E.2d 205 (Ga. Ct. App. 1956), and on the voidability of their agreements, in support of a contrary conclusion, is misplaced.

Hambrick v. Bedsole, supra at 208-209, involved a contract under which title to property was not to pass and possession was not to be delivered until the full, lump-sum purchase price was paid. The agreement did not provide for either a downpayment or installment payments. See id. The court decided that the contract "was a mere executory agreement to sell and did not constitute a sale", on the grounds that the buyer "gained by the contract neither title to, nor the right of possession of" the subject property. Id. at 209. The situation in Hambrick v. Bedsole, supra, thus bears almost no resemblance to that in the instant case and cannot inform our analysis.

As regards the voidability of the contracts for deed, we see no material difference between the provisions on default here and those contained in the agreement in Chilivis v. Tumlin Woods

Realty Associates, Inc., supra.  In either case, if the buyer

were to default and refuse to complete the transaction, the

seller would have no further recourse against the buyer

personally.  The seller could look only to the property itself as

a means to recover the full value of the aborted deal and would

be unable to enforce remaining payments or deficiencies against

the buyer as a personal liability.  Yet, the court still

characterized the Chilivis instrument as creating an equitable

interest in the buyer and leaving the seller with a mere security

interest.  Hence, we do not believe that Georgia courts would

hold a lack of recourse against the purchaser, following default

of an otherwise binding agreement, to prevent a finding that the

benefits and burdens of ownership, i.e., an equitable interest,

were nonetheless transferred when the contract was signed.

Accordingly, the sale should be considered complete for tax

purposes, regardless of the possibility of future voidance.

The foregoing conclusion is further buttressed by the

weight, or lack thereof, that other courts have given to various

types of nonrecourse clauses in evaluating the completeness of a

sale.  For instance, the sales agreement at issue in Commissioner

v. Baertschi, 412 F.2d 494, 497 (6th Cir. 1969), revg. 49 T.C.

289 (1967), contained the following language:

> The remedy or recourse of said parties of the first
> part for the non-performance of any obligation of the
> parties of the second part hereunder shall be limited
> solely to the moneys paid hereunder, and to the herein

> described property, and said parties of the second part shall not be liable for any deficiency arising from the sale of said property in any way, capacity or manner whatsoever, nor shall said parties of the first part have the right to, nor seek, a deficiency or other money judgment against said parties of the second part.

The court, however, noted such factors as the buyers' absolute right to title on full payment; the sellers' lack of any right to cancel except upon the purchasers' default; and the buyers' possession of, and responsibility for taxes and insurance on, the property. See id. at 498. Given these elements, the court declared: "we do not feel that the single fact of a 'no recourse' clause served to delay the finality of this sale until final payment of the total purchase price had been made." Id. An identical result was reached on similar facts in Clodfelter v. Commissioner, 426 F.2d 1391, 1395 (9th Cir. 1970).

While we acknowledge that our opinion in Baertschi reached a contrary conclusion on this issue, we have now reconsidered our holding in light of reversal by the Court of Appeals for the Sixth Circuit. We are persuaded that the position of the Court of Appeals on the effect of a non-recourse provision rests on sound legal principles. Accordingly, Baertschi v. Commissioner, 49 T.C. 289 (1967), will no longer be followed. We further note that this approach better harmonizes with our earlier ruling that contracts with provisions closely analogous to those here and which by their terms became "utterly null and void" on the buyer's default, with the seller retaining all moneys paid,

represented closed sales in the year entered. See Arnold v. Commissioner, a Memorandum Opinion of this Court dated Mar. 17, 1953. We see no reason to infer differently here.

B. Reporting of Gain--Timing of Inclusion

Thus, having decided that petitioners' contracts for deed effected a completed sale when executed, we proceed to the question of when gain from such sales must be included in gross income. The general rule for the taxable year of inclusion is set forth in section 451(a): "The amount of any item of gross income shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under the method of accounting used in computing taxable income, such amount is to be properly accounted for as of a different period." Regulations then specify as follows:

> Under an accrual method of accounting, income is
> includible in gross income when all the events have
> occurred which fix the right to receive such income and
> the amount thereof can be determined with reasonable
> accuracy. * * * Under the cash receipts and
> disbursements method of accounting, such an amount is
> includible in gross income when actually or
> constructively received. * * * [Sec. 1.451-1(a), Income
> Tax Regs.]

Taxable income, in turn, generally "shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books", with the exception that "if the method used does not clearly reflect income, the

computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income." Sec. 446(a) and (b).

As used in section 446, the term "method of accounting" encompasses "not only the over-all method of accounting of the taxpayer but also the accounting treatment of any item". Sec. 1.446-1(a)(1), Income Tax Regs. Furthermore, it has been recognized repeatedly that this section grants the Commissioner broad discretion, such that to defeat a proposed change thereunder, the taxpayer must establish that the Commissioner's determination is "'clearly unlawful'" or "'plainly arbitrary'". Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 532-533 (1979) (quoting Lucas v. American Code Co., 280 U.S. 445, 449 (1930), and Lucas v. Kansas City Structural Steel Co., 281 U.S. 264, 271 (1930)). However, if the taxpayer's method does clearly reflect income, the Commissioner cannot require the taxpayer to change to a different method even if the Commissioner's method more clearly reflects income. See Ford Motor Co. v. Commissioner, 71 F.3d 209, 213 (6th Cir. 1995), affg. 102 T.C. 87 (1994).

In the case at bar, the only evidence in the record which speaks to GIA's overall method of accounting is the Schedules C filed with petitioners' tax returns. On each such Schedule C, the box indicating "Accrual" was checked. We therefore have no basis on which to conclude that GIA was other than an accrual

method business and must proceed on the assumption that, excepting the contract for deed transactions, its items of income and expense were reported using this method.

Under the accrual method, gain arising from the contracts for deed would be reportable in the year when the right to receive the income became fixed and the amount of the income became reasonably determinable. Since the instruments at issue expressly dictated price, the latter requirement regarding amount of income is not in question here. Concerning the former element of a fixed right to the income, we reiterate the well-established principle that "In applying the all events test, this and other courts have distinguished between conditions precedent, which must occur before the right to income arises, and conditions subsequent, the occurrence of which will terminate an existing right to income, but the presence of which does not preclude accrual of income." Charles Schwab Corp. & Subs. v. Commissioner, 107 T.C. 282, 293 (1996), affd. 161 F.3d 1231 (9th Cir. 1998).

Here, the only circumstance in which GIA could fail to receive the full amount of the purchase price would be a default by the buyer. A default, however, is a condition subsequent. As we stated regarding the similar sales contract in Clodfelter v. Commissioner, 48 T.C. 694, 701 (1967):

> the purchaser was given immediate possession; it
> thereupon assumed the rights and obligations of

> beneficial ownership; and thereafter such property interest and beneficial ownership would not be subject to termination or forfeiture, except on the happening of a condition subsequent--i.e., a default.

Thus, because the buyer's obligation to pay the full price under the agreements in the instant case was otherwise unconditional, execution of the contracts fixed petitioners' right to these sums. Our declaration that "the amount of and right to the purchase price were fixed and unqualified", in the context of another sales agreement which provided for forfeiture of the contract and retention of all moneys paid in liquidation of damages, is equally applicable here. Elsinore Cattle Co. v. Commissioner, a Memorandum Opinion of this Court dated Feb. 21, 1950. Accordingly, both elements for inclusion were met in the year of signing, the year the transaction was completed for tax purposes.

This is consistent with the longstanding position of this Court that the factual predicate requiring income inclusion in a given year by an accrual method taxpayer is completion of a sale in that year. For instance, it was held as early as 1925, with respect to a contract entered in 1918 with all payments to be made in subsequent years: "The transaction was a completed sale in the year 1918, and, as the taxpayer kept its books of account on the accrual basis, the sale price was properly accruable in that year. We hold, therefore, that the profits arising from the

sale in question were income to the taxpayer in the year 1918."
Parish-Watson & Co. v. Commissioner, 2 B.T.A. 851, 860 (1925);
see also sec. 15A.453-1(d)(2), Temporary Income Tax Regs., 46
Fed. Reg. 10717 (Feb. 4, 1981).  But see sec. 1.1001-1(g), Income
Tax Regs., for sales or exchanges occurring on or after August
13, 1996.

We additionally point out that, to the extent petitioners
argue no income is required to be recognized because the voidable
notes evidencing the debt have no fair market value and thus are
not the equivalent of cash, this consideration has no place in
the analysis of an accrual method entity.  The following
explanation clearly distinguishes between accrual and cash
accounting in this regard:

> An agreement, oral or written, of some kind is
> essential to a sale.  If payment is made at the same
> time that the obligation to pay arises under the
> agreement, then the profit would be reported at that
> time no matter which method was being used.  However,
> the situation is different when the contract merely
> requires future payments and no notes, mortgages, or
> other evidence of indebtedness such as commonly change
> hands in commerce, which could be recognized as the
> equivalent of cash to some extent, are given and
> accepted as a part of the purchase price.  That kind of
> a simple contract creates accounts payable by the
> purchasers and accounts receivable by the sellers which
> those two taxpayers would accrue if they were using an
> accrual method of accounting in reporting their income.
> But such an agreement to pay the balance of the
> purchase price in the future has no tax significance to
> either purchaser or seller if he is using a cash
> system.  [Johnston v. Commissioner, 14 T.C. 560, 565
> (1950).]

Consequently, unless a specific exception to the above general rules will permit deferral, we are satisfied that GIA, as an accrual method business, must recognize and report income attributable to the contracts for deed in the years of their respective executions.

The primary exception for income deferral is section 453, which provides for the "installment method" to be used in reporting an "installment sale". Petitioners do not, however, appear to argue that this statute is applicable. We also note that a "dealer disposition", including "Any disposition of real property which is held by the taxpayer for sale to customers in the ordinary course of the taxpayer's trade or business", is excluded from the definition of an installment sale. Sec. 453(b)(2)(A), (l)(1)(B). The parties here have stipulated that "GIA was in the business of selling, financing, and renting residential real property." Additionally, although a further exception can permit use of the installment method for sales of residential lots, see sec. 453(l)(2)(B), the record before us fails to establish that petitioners could qualify under this provision. The contracts indicate that the majority of the properties were houses, not lots. Also, as to the contracts which may have been for land alone, no evidence shows that the remaining requirements for this election have been met. See sec. 453(l)(2)(B)(ii), (l)(3); Wang v. Commissioner, T.C. Memo. 1998-

127.  In any event, petitioners have nowhere contended that the various transactions should be treated differently.

A second basis for potential income deferral, to which petitioners do make reference on brief as an apparent alternative argument, is the recovery of cost approach.  However, substantive requirements for use of this method aside, we have refused to allow taxpayers to switch to cost recovery accounting without following the established procedures under section 446(e) for requesting such a change from the Commissioner.  See Wang v. Commissioner, supra; see also Witte v. Commissioner, 513 F.2d 391 (D.C. Cir. 1975) (holding that section 446(e) requires that consent be sought even for a change from an improper to a proper accounting method), revg. in part and remanding T.C. Memo. 1972-232.  It is undisputed that petitioners have never filed the requisite Form 3115.  See sec. 1.446-1(e)(3)(i), Income Tax Regs. The Commissioner thus was not obligated to consider this approach in analyzing whether petitioners' accounting clearly reflected income or in determining a method which did so.

To summarize, respondent determined that gain of an accrual method business must be reported consistently with that method in order to clearly reflect income.  Given the above, we now conclude that such determination accords with settled law and precedent.  Hence, petitioners have not shown that the proposed change is either clearly unlawful or plainly arbitrary.  We hold

that petitioners must include the gain attributable to GIA's contracts for deed, the excess of sales price over basis, in their gross income for the respective years of the agreements' execution.

III. Reduction of Net Operating Loss Carryovers

Section 172(a) authorizes a net operating loss deduction. Essentially, a net operating loss is the excess of deductions over gross income, with enumerated modifications. See sec. 172(c) and (d). The net operating loss so determined may be carried back to the 3 preceding taxable years and carried forward to the 15 succeeding years, until absorbed by taxable income. See sec. 172(b).

On their returns for 1993 through 1995, petitioners claimed deductions for net operating loss carryovers from prior years. In the notice of deficiency, respondent disallowed a portion of the amount claimed for 1993 and the full amount for years 1994 and 1995. Respondent argues that the net operating loss carryovers were overstated and should be allowed only to the extent the underlying losses were incurred and remain unabsorbed after taking into account certain adjustments.

Two primary adjustments are referenced in the parties' stipulations and briefs. First, both parties are apparently in agreement that the net operating loss carryovers should be increased to reflect the insurance commissions and mortgage

placement fees which we previously held should have been reported by Mr. Latzak.  See Latzak v. Commissioner, T.C. Memo. 1994-416. Second, however, respondent also contends that the carryovers should be reduced to reflect the income attributable to contracts for deed entered in years 1989 through 1992, as such gain was properly reportable in those years.

In general, the taxpayer bears the burden of establishing both the actual existence of net operating losses in the prior years and the amount of such losses that may be carried to the years at issue.  See Rule 142(a); Jones v. Commissioner, 25 T.C. 1100, 1104 (1956), revd. and remanded on other grounds 259 F.2d 300 (5th Cir. 1958); Ocean Sands Holding Corp. v. Commissioner, T.C. Memo. 1980-423, affd. without published opinion 701 F.2d 167 (4th Cir. 1983); Moyer v. Commissioner, T.C. Memo. 1976-69, affd. without published opinion 565 F.2d 152 (3d Cir. 1977).  We have jurisdiction to consider such facts related to years not in issue as may be necessary for redetermination of tax liability for the period before the Court.  See sec. 6214(b).

Here, petitioners have not and could not, given our conclusions above, establish their incurrence of and entitlement to deduct losses premised in part on a failure to report income attributable to the contracts for deed entered in the loss years. We agree with respondent that these adjustments should be taken into account along with those based on the income properly

reportable by Mr. Latzak.  Thus, we hold that to the extent recomputation applying these adjustments shows that GIA's net operating loss carryovers do not exceed the amount allowed by respondent for 1993, petitioners are not entitled to deduct such further amounts.

To reflect the foregoing and the parties' concessions,

<u>Decision will be entered</u>

<u>under Rule 155</u>.

Reviewed by the Court.

WELLS, CHABOT, WHALEN, COLVIN, HALPERN, CHIECHI, LARO, FOLEY, VASQUEZ, GALE, THORNTON, and MARVEL, <u>JJ</u>., agree with this majority opinion.

SWIFT and RUWE, <u>JJ</u>., concur.