T.C. Memo. 2006-176

UNITED STATES TAX COURT

THOMAS R. JONES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14608-04.             Filed August 22, 2006.

Thomas R. Jones, pro se.

<u>Susan S. Hu</u> and <u>Edwin A. Herrera</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

SWIFT, <u>Judge</u>:  Respondent determined a deficiency in
petitioner's 2000 Federal income tax and additions to tax as
follows:

|  | Additions to Tax | |
| Deficiency | Sec. 6651(a)(1) | Sec. 6654(a) |
| $2,726 | $682 | $146 |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The issues for decision are whether petitioner may deduct as mortgage interest and real property taxes amounts petitioner paid under a real property lease-option agreement and whether petitioner is liable for additions to tax under sections 6651(a)(1) and 6654(a).

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

At the time the petition was filed, petitioner resided in Highland, California.

Prior to 2000, petitioner was employed by Union Pacific Railroad.

In February of 1995, petitioner moved to a house in Highland, California (the property), renting the property under a written rental agreement from Robert Peterson (Peterson) for $850 per month. Petitioner's first check to Peterson, written on February 14, 1995, was for $2,100 and included rent for the first and last unspecified month of the rental period and a $400 security deposit.

In mid-August of 1996, petitioner and Peterson modified their rental agreement with respect to the property, converting

the agreement to a lease-option agreement (the agreement). It is not clear whether the agreement was formalized in a written document, and many of its terms are not clear.

Under the agreement, petitioner was to pay Peterson $5,000 for an option to purchase the property at any time prior to August of 2002. Also under the agreement, petitioner's monthly rental payments increased from $850 to $1,051 per month. The $1,051 was equivalent to the amount Peterson paid to his mortgage lender each month on the mortgage on the property. In written correspondence to petitioner, Peterson informed petitioner that "about $990 [of the $1,051] is the deductible interest," but Peterson did not specify by whom he intended the interest to be deductible.

Under the agreement, it was understood that petitioner was to pay the real property taxes on the property, and Peterson apparently told petitioner that for Federal income tax purposes petitioner could deduct the property taxes.

Peterson agreed to continue to pay fire insurance on the property for at least 1 additional year in exchange for petitioner's agreeing to repair the roof.

According to the agreement, to exercise the purchase option any time before August of 2002, petitioner was to pay Peterson a second $5,000 and to pay off the outstanding balance of the

mortgage on the property, which balance was $106,000 at the time the agreement was entered into.

In September of 1996, petitioner paid Peterson the $5,000 for the option to purchase the property. Beginning in September of 1996 and continuing through 2000, petitioner also paid Peterson $1,051 per month.

In a December 2, 1998, letter to petitioner, Peterson referred to the property as "my property" and acknowledged that he, Peterson, was still using the property as his address for the purpose of receiving mail. Peterson consistently referred to the agreement as an "option" agreement, and in September of 2001 Peterson wrote a letter to petitioner in which Peterson made it clear that he understood that petitioner was not yet bound under the agreement to purchase the property.

In 1999, Peterson considered refinancing the mortgage on the property and so informed petitioner, telling petitioner that this would "actually [result] in a savings to * * * [petitioner] during * * * [the] option period." Petitioner apparently wanted to participate in the refinancing of the property. Petitioner, however, did not respond when Peterson mailed to petitioner bank disclosure documents, and the refinancing of the mortgage on the property was never completed.

In connection with his efforts to refinance, Peterson queried petitioner about the condition of the property and

informed petitioner that petitioner was responsible for repairing damage to the garage door, replacing a wooden barrier that blocked access to a building on the property, and removing clutter from the yard. Throughout the term of the agreement, petitioner complied with these and other maintenance requests from Peterson.

From 1996 through 2000, petitioner continued to live on the property, repaired the roof of the property, and paid real property taxes on the property, including $806 in 2000. The real property taxes were assessed to Peterson, and Peterson apparently paid the fire insurance relating to the property.

In 1999, petitioner was diagnosed with an illness which involved mental distress, and through 2000 petitioner did not work.

On petitioner's 1999 individual Federal income tax return, prepared by a tax return preparer, petitioner reported zero tax liability.

In 2000, petitioner received $19,500 in Social Security benefits from the Railroad Retirement Board (RRB) and $22,324 in disability payments from Union Central Life Insurance (UCLI) relating to his mental distress.

For 2000, RRB submitted to respondent a Form 1099-R, Distributions From Pensions, Annuities, Retirement or Profit-Sharing Plans, etc., with regard to the $19,500 paid to

petitioner, but it is not clear whether petitioner received a copy of this Form 1099.

Also for 2000, UCLI submitted to respondent a Wage and Tax Statement, Form W-2, Wage and Tax Statement, with regard to the $22,230 paid to petitioner, and petitioner received a copy of this W-2.

Without consulting a tax professional and apparently under the impression that the disability benefits he received in 2000 did not constitute taxable income, petitioner did not file a Federal income tax return for 2000.

On his 2000 individual Federal income tax return, Peterson claimed an interest deduction in the amount of the total monthly mortgage payments that were made on the property in 2000.

In May of 2002, petitioner obtained a $100,000 mortgage on the property, and Peterson's mortgage was paid off. Petitioner exercised the option to purchase the property and paid Peterson the required $5,000 exercise price. The legal title to the property was then transferred from Peterson to petitioner.

Upon audit, respondent determined that petitioner's 1999 Federal income tax liability was $13,236. Petitioner remitted this amount to respondent plus penalties and interest.

At respondent's request, on October 9, 2002, petitioner filed his 2000 individual Federal income tax return, upon which he reported zero taxable income.

On May 3, 2004, respondent mailed to petitioner a notice of deficiency in the amount of $2,726 with regard to petitioner's 2000 Federal income tax return in which respondent determined that $3,127 of the $19,500 petitioner received from RRB and the $22,230 received from UCLI constituted taxable income to petitioner.  Respondent also determined that petitioner was liable for a section 6651(a)(1) failure to file addition to tax and a section 6654(a) addition to tax for failure to make estimated tax payments.

For 2000, petitioner does not dispute the income adjustments relating to the funds received from RRB and UCLI.  Petitioner, however, argues that he should be able to deduct as mortgage interest and as real property taxes a portion of the payments he made in 2000 relating to the property.

OPINION

Interest and Property Tax Payments

Under section 163, interest paid on a mortgage relating to a qualified residence generally is deductible.  Sec. 163(h)(2) and (3).  For the mortgage interest to be deductible by a particular taxpayer, the mortgage must be the obligation of the taxpayer claiming the deduction, not the obligation of another.  Golder v. Commissioner, 604 F.2d 34, 35 (9th Cir. 1979), affg. T.C. Memo. 1976-150.  However, under section 1.163-1(b), Income Tax Regs., even though property may not be in a taxpayer's name, as long as

the taxpayer is the legal or equitable owner thereof and is at least indirectly liable on the mortgage, the taxpayer may deduct mortgage interest he or she pays relating to the property.

Under section 164, real property taxes paid by a taxpayer may be deductible by the person upon whom the taxes are imposed. Sec. 1.164-1(a), Income Tax Regs.; see Magruder v. Supplee, 316 U.S. 394, 396 (1942). The equitable or beneficial owner of real property who pays taxes assessed against the property to protect his or her interest therein may deduct the taxes he or she paid even though legal title to the property may be held by another person. Estate of Movius v. Commissioner, 22 T.C. 391, 394 (1954).

Generally, taxpayers bear the burden of proving that they are entitled to deductions claimed. See Rule 142(a); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934); Hradesky v. Commissioner, 65 T.C. 87, 90 (1975), affd. per curiam 540 F.2d 821 (5th Cir. 1976).

For Federal income tax purposes, a sale occurs upon the earlier of transfer of legal title or the practical assumption of the benefits and burdens of ownership. Keith v. Commissioner, 115 T.C. 605, 611 (2000); Baird v. Commissioner, 68 T.C. 115, 124 (1977). In deciding whether transfer of either legal title or the benefits and burdens has occurred, we look to State law. Keith v. Commissioner, supra at 611.

In the instant case, the August 1996 agreement between petitioner and Peterson was not accompanied by a transfer of legal title, so we must decide whether the agreement included terms that were sufficient to transfer to petitioner the benefits and burdens of ownership of the property.

As we observed in Keith v. Commissioner, supra, factors frequently cited by this and other courts as indicative of the benefits and burdens of property ownership include:

> A right to possession; an obligation to pay taxes, assessments, and charges against the property; a responsibility for insuring the property; a duty to maintain the property; a right to improve the property without the seller's consent; a bearing of the risk of loss; and a right to obtain legal title at any time by paying the balance of the full purchase price. [Id. at 611-612.]

The key question before us is whether the agreement between petitioner and Peterson constituted a mere option or an actual purchase of the property by petitioner. If the agreement constituted a mere option and not a purchase, then under California law the agreement would vest in petitioner no ownership interest in the property. See Staudigl v. Harper, 173 P.2d 343, 347 (Cal. Dist. Ct. App. 1946).

The test of whether the agreement constituted an option or a purchase by petitioner is whether petitioner was obligated to purchase the property. See Allen v. Smith, 114 Cal. Rptr. 2d 898, 905 (Ct. App. 2002) (written contract treated as purchase

and sale, not as an option, where buyer was obligated to proceed with the purchase after inspection contingency was satisfied); Welk v. Fainbarg, 63 Cal. Rptr. 127, 132-133 (Ct. App. 1967)

In the instant case, the bulk of the evidence establishes that Peterson had no legal authority to require specific performance by petitioner. Petitioner was not obligated to exercise the option or otherwise liable to pay the purchase price to Peterson if petitioner decided not to exercise the option. In the communications between petitioner and Peterson, Peterson referred to the exercise of the option contract as something petitioner could exercise or not as he chose. The communications between petitioner and Peterson referred to Peterson as the owner.

Although we conclude that the agreement constituted only an option and not a purchase or sale of the property itself, we consider petitioner's claim that he held an equitable ownership interest in the property.

Petitioner argues that under California law he should be considered to beneficially own the property. However, under California law beneficial ownership contrary to legal title may be established only by clear and convincing proof. Cal. Evid. Code sec. 662 (West 1995); see Pac. Sw. Realty Co. v. County of Los Angeles, 820 P.2d 1046, 1052 (Cal. 1991).

Beneficial ownership has been characterized as when "the buyer has the possession and use of the property to the complete exclusion of the seller, subject only to the seller's remedies in case of default." County of San Diego v. Davis, 33 P.2d 827, 828 (Cal. 1934).

Petitioner argues that under the terms of the agreement, beginning in September of 1996 petitioner acquired equitable ownership of the property. Petitioner points out that he possessed the property, that after entering into the agreement he began making larger payments to Peterson, and that he paid $5,000 to Peterson as well as property taxes on the property.

We agree with respondent that the evidence does not establish that during 2000 petitioner was the equitable owner of the property.

Various benefits and burdens were retained by Peterson. Peterson continued to pay insurance on the property and to pay other liabilities as owner of the property. Peterson made decisions relating to improvements on the property.

We are sympathetic to petitioner, as the agreement did convey to petitioner some benefits and burdens of ownership. However, given the facts before us, California courts would construe the agreement at issue as an option contract, not as a purchase and sale contract.

Petitioner has not met his burden of proving either that petitioner and Peterson in fact had an agreement for the purchase and sale of the property (as opposed to an option agreement) or that in 2000 petitioner had acquired sufficient benefits and burdens relating to the property to be deemed the equitable owner of the property.

For 2000, petitioner is not entitled to deduct as mortgage interest or as real property taxes the payments he made on the property.

<u>Additions to Tax</u>

Under section 7491(c), the Commissioner has the burden of production with respect to additions to tax. Once the Commissioner meets that burden, the burden of proof shifts back to the taxpayer with regard to additions to tax. Rule 142(a); <u>Higbee v. Commissioner</u>, 116 T.C. 438, 446 (2001). Respondent has established petitioner's tax liability and therefore has satisfied his burden of production under section 7491(c).

To defend against a section 6651 addition to tax for failure timely to file a tax return, a taxpayer must establish both that failure to timely file was not due to willful neglect and that it was due to reasonable cause. <u>United States v. Boyle</u>, 469 U.S. 241, 245 (1985).

Willful neglect means conscious, intentional failure or reckless indifference. <u>Id.</u> A failure to file will be regarded

as due to "reasonable cause" if the taxpayer exercised ordinary business care and prudence and nevertheless was unable to file his return by the due date.  Crocker v. Commissioner, 92 T.C. 899, 913 (1989); sec. 301.6651-1(c)(1), Proced. & Admin. Regs.

In the absence of competent tax advice, a mistaken belief on the part of a taxpayer that no tax return was required under the statute generally will not support reasonable cause for not filing a tax return.  Shomaker v. Commissioner, 38 T.C. 192, 202 (1962); French v. Commissioner, T.C. Memo. 1991-196 (honest belief that no tax was due does not constitute reasonable cause where a taxpayer did not make good faith effort to ascertain whether filing was necessary).

Where a taxpayer's disability is raised as part of a reasonable cause defense, we have looked to the severity of the disability and the impact it had on the taxpayer's life, explaining that "significant psychiatric disorder and * * * [mental incapacitation] during the period under consideration", Shaffer v. Commissioner, T.C. Memo. 1994-618, or confinement to various hospitals for "severe mental illness," Carnahan v. Commissioner, T.C. Memo. 1994-163, affd. 70 F.3d 637 (D.C. Cir. 1995), may provide reasonable cause.  But see Thomas v. Commissioner, T.C. Memo. 2005-258 (taxpayer suffering from bilateral tendinitis, carpal tunnel syndrome, and depression did

not show reasonable cause when she was employed and running her own business during the period in question).

It is undisputed that petitioner herein failed to file a 2000 Federal income tax return within the prescribed deadline. Petitioner argues that he simply did not realize that disability benefits were to be treated as taxable income.

Especially, however, after receiving the UCLI W-2 form showing the disability benefits as taxable, petitioner did not seek the advice of a professional and did not exercise ordinary care and prudence as to the taxability of the disability payments.

We conclude that neither petitioner's lack of knowledge nor his health problems constitute reasonable cause for his failure to file his 2000 Federal income tax return. Petitioner is liable for the section 6651(a)(1) addition to tax for failure to file a return.

Section 6654(a) imposes an addition to tax on an underpayment of estimated tax unless one of the statutory exceptions applies. Niedringhaus v. Commissioner, 99 T.C. 202, 222 (1992). The enumerated exceptions provide that the addition shall not be imposed: (1) If the tax is less than $1,000, or (2) where there was no tax liability for the preceding taxable year. Sec. 6654(e)(1) and (2). For the latter purpose, we look to the tax liability shown on the return for the previous year,

rather than the tax liability ultimately assessed by the Commissioner, even when income for the preceding year was fraudulently understated on the return.  Mendes v. Commissioner, 121 T.C. 308, 324 (2003).  An invalid return, however, for the previous year will not suffice for purposes of the safe harbor under section 6654(e)(2).  Mendes v. Commissioner, supra.

If petitioner's 1999 tax return is to be treated as a valid tax return on which zero liability was reported, despite respondent's later deficiency assessment, petitioner might qualify for the section 6654(e)(2) safe harbor for 2000.  Because, however, the record herein does not include evidence as to the validity of petitioner's 1999 income tax return, this safe harbor is not available to petitioner.

Section 6654(e)(3)(B)(i) and (ii) also provides an exception to this addition to tax where a taxpayer became disabled during either the year the estimated tax payments were not made or the preceding year, and where the tax underpayment is due to reasonable cause and not due to willful neglect.  See Thomas v. Commissioner, T.C. Memo. 2005-258.

Petitioner was diagnosed with mental distress in 1999, the year preceding the year in issue.  Petitioner, however, has not shown that his failure to pay estimated tax was due to reasonable cause.

For 2000, petitioner is liable for a section 6654 addition to tax.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.