T.C. Memo. 2021-87

UNITED STATES TAX COURT

BLOSSOM DAY CARE CENTERS, INC., Petitioner <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 3868-12, 3869-12.[1]       Filed July 13, 2021.

<u>Steven P. Flowers</u> and <u>Nathalie M. Cornett</u>, for petitioner.

<u>William F. Castor</u> and <u>Vassiliki Economides Farrior</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PARIS, <u>Judge</u>:  By notice of deficiency dated November 14, 2011,

respondent determined deficiencies in the Federal income tax of Blossom Day

---

[1]These cases were consolidated for trial, briefing, and opinion.  The subject of this opinion will pertain to those issues arising out of docket No. 3868-12. Those issues arising out of docket No. 3869-12 are addressed in <u>Blossom Day Care Ctrs., Inc. v. Commissioner</u>, T.C. Memo. 2021-86, filed today.

[*2] Care Centers, Inc. (petitioner), of $70,239, $109,813, $109,557, and $130,967 and civil fraud penalties under section 6663[2] of $52,679.25, $82,359.75, $82,167.75, and $98,225.25 for 2004, 2005, 2006, and 2007, respectively. In the alternative respondent asserts accuracy-related penalties pursuant to section 6662(a) for the years at issue. Respondent additionally determined that petitioner is liable for an addition to tax pursuant to section 6651(a)(1) of $32,741.75 for 2007.

After concessions,[3] the issues for decision are:

(1) whether petitioner's gross receipts should be adjusted by -$203,659, -$314,797, $160,701, and $18,888 for 2004, 2005, 2006, and 2007, respectively;

(2) whether petitioner failed to report capital gain income of $58,980 for 2004 on the recapture of prior-year depreciation on two vehicles and gain on the trade-in of a third vehicle;

---

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[3]Petitioner has conceded that it is not entitled to deduct: (1) charitable contributions of $2,266 for 2004; (2) rental expenses of $136,652 for 2005; (3) compensation to officers of $100,000 for 2006; (4) legal and professional fees of $2,000 for 2006; and (5) bank charges of $1,551 for 2007. Respondent has conceded that petitioner is entitled to deduct repairs expenses of $5,291 for 2006.

**[*3]**    (3) whether petitioner failed to report capital gain of $128,468 for 2005 on the transfer of real property to Hacker Corp.;

(4) whether petitioner received rental income from property at Katy St., Sand Springs, Oklahoma, of $2,997, $5,284, and $4,851 for 2005, 2006, and 2007, respectively;

(5) whether petitioner is entitled to deduct depreciation of $56,374, $26,708, $20,820, and $51,415 for 2004, 2005, 2006, and 2007, respectively;

(6) whether petitioner is entitled to deduct business expenses, determined by respondent to be nonbusiness or personal expenses, of $278,556, $360,405, $48,324, and $21,830 for 2004, 2005, 2006, and 2007, respectively;

(7) whether petitioner is entitled to deduct management fees paid to Hacker Corp. of $187,500, $84,250, and $67,784, in excess of those amounts respondent allowed for 2004, 2005, and 2006, respectively;

(8) whether petitioner is entitled to disallowed interest expense deductions of $12,917, $17,963, and $17,359 for 2004, 2006, and 2007, respectively, and an increased deduction of $43,245 for 2005;

(9) whether petitioner is entitled to deduct repairs expenses of $1,674, $38,775, $18,655, and $27,700 in excess of those amounts respondent allowed for 2004, 2005, 2006, and 2007, respectively;

**[*4]**  (10) whether petitioner is entitled to deduct supplies expenses of $436,408

in excess of the amount respondent allowed for 2007;

(11) whether petitioner is entitled to claimed Indian employment tax credits

pursuant to section 45A for 2004, 2005, 2006, and 2007;

(12) whether petitioner is entitled to deduct wage expenses of $198,740,

$209,200, $220,210, and $231,800 for 2004, 2005, 2006, and 2007, respectively,

on the basis of respondent's determinations of wages paid to Barry A. Hacker and

Celeste Hacker (Mr. and Mrs. Hacker, respectively, or collectively, Hackers);[4]

(13) whether petitioner is liable for an addition to tax for failure to timely

file, pursuant to section 6651(a)(1), for 2007; and

(14) whether petitioner is liable for the civil fraud penalties under section

6663(a) or, in the alternative, accuracy-related penalties under section 6662(a), for

2004 through 2007.

---

[4]In addition to the Notice of Deficiency that is the subject of this opinion, respondent issued to petitioner a Notice of Determination of Worker Classification, in which he determined that the Hackers were employees of petitioner and remuneration paid to the Hackers constituted wages.  The Court resolved those issues relating to respondent's determination of worker classification in Blossom Day Care Ctrs., Inc. v. Commissioner, T.C. Memo. 2021-86, filed today.

**[*5]**                    FINDINGS OF FACT

I.    Petitioner's Background

Petitioner is an Oklahoma corporation, originally incorporated in 1986. When the petition was filed, petitioner's principal place of business was in Tulsa, Oklahoma. Petitioner was a valid corporation in the State of Oklahoma during all years at issue.

During the years at issue petitioner operated child daycare centers in the Tulsa metropolitan area. Before May 2005 petitioner operated five daycare centers, as follows:

(1) 801 Long St., Sand Springs, Oklahoma (Long St.);

(2) 4744 South Mingo Rd., Tulsa, Oklahoma (Mingo Rd.);

(3) 800 North 81st West Ave., Tulsa, Oklahoma (81st West Ave.);

(4) 11505 East 76th St. North, Owasso, Oklahoma (76th St. North); and

(5) 9135 East 61st St., Tulsa, Oklahoma (East 61st St.).

In May 2005 petitioner opened a sixth location at 1020 South Elm Pl., Broken Arrow, Oklahoma (Elm Pl.). Petitioner operated the six daycare centers from May 2005 through the years at issue.

**[*6]** II.     The Hackers

Since 1986 and at all relevant times, the Hackers were petitioner's only corporate officers and sole shareholders, with Mrs. Hacker owning 51% and Mr. Hacker owning 49% of petitioner's stock.

Mrs. Hacker, who holds an associate's degree in child development, opened petitioner as an unincorporated business entity in 1982. Since petitioner's incorporation in 1986 and through the years at issue, Mrs. Hacker served as petitioner's president, as well as its director of curriculum and education for the 90 employees, students, and six locations. She served as petitioner's top manager, personally overseeing and supervising employees, making hiring and firing decisions, and managing petitioner's six daycare directors. All of petitioner's employees ultimately reported to her.

Mr. Hacker, also since 1986 and through the years at issue, served as petitioner's corporate vice president, as well as its secretary and treasurer. During the years at issue, Mr. Hacker also served as petitioner's director and as its director of accountability and finance. He had authority over all of petitioner's bank accounts, and his daily responsibilities included depositing parents' payments for childcare into petitioner's bank accounts and personally writing all of the payroll checks to petitioner's 90 employees.

**[*7]** Both Mr. and Mrs. Hacker were members of the Oklahoma Child Care Association, and Mr. Hacker was a member of its board from 2004 through 2008. This State organization focused on childcare issues, working with the Oklahoma Department of Human Services (ODHS) regarding training, education, and comments on regulations. Petitioner's daycare centers were licensed by ODHS, and the Hackers were responsible for ensuring that the programs and employees met ODHS standards.

During the years at issue, Mr. and Mrs. Hacker controlled all of petitioner's childcare policies and education and coordinated all physical location and program maintenance decisions. They both actively participated in petitioner's daily operation, frequently working 50 to 60 hours per week at all levels, including those duties described above, as well as paperwork and front office duties, classroom teaching and supervision of teachers, purchasing and delivering food for petitioner's childcare programs, and maintenance and custodial duties, if necessary.

The Hackers have three children, sons Steven and Ashley, born in 1975 and 1979, respectively, and daughter Whitney, born in 1987 (collectively, Hacker children). The Hacker children were not petitioner's employees.

**[*8]** III.    Hacker Corp.

A.    Background and Management Fees

In 2002 Mr. Hacker incorporated the Hacker Corp. as an Oklahoma corporation. During all years relevant to these cases, Hacker Corp. elected to be treated as an S corporation for Federal income tax purposes.

During 2004 through 2008 petitioner made payments in the form of management fees to Hacker Corp., which in turn paid wages to the Hackers and their children for services they rendered to petitioner. Ashley was a paid employee of Hacker Corp. from 2005 through 2008. Steven was a paid employee of Hacker Corp. during 2004 and 2005. From January 2006 to August 2008 Steven operated a car stereo modification business and was not employed by Hacker Corp. Whitney was not a paid employee of Hacker Corp. during the years at issue. No written contract or fee agreement was prepared in connection with petitioner's agreement with Hacker Corp.

B.    Real Property Transfers

Before May 2005, petitioner or the Hackers owned the real properties where petitioner's daycare locations operated as follows:

[*9]

| Daycare location | Owner |
| --- | --- |
| Long St. and Mingo Rd. | Mr. and Mrs. Hacker |
| 81st West Ave. | Petitioner |
| 76th St. North | Petitioner |
| East 61st St. | Petitioner |
| Elm Pl. | Petitioner |

In May 2005 title to each property was transferred by quitclaim deed to Hacker Corp., and the transfers were recorded in the Tulsa County land records. Following the transfers, Hacker Corp. assumed payment of the property taxes and began making payments on the mortgages securing the properties held by Security Bank. Petitioner continued to operate its daycare centers at the same locations. No formal lease agreement between petitioner and Hacker Corp. was signed, but petitioner began making rent payments either directly to Hacker Corp. or to Security Bank on behalf of Hacker Corp. in payment of the mortgages. Beginning on its tax return for 2005, Hacker Corp. claimed deductions for depreciation with respect to the buildings, for payment of the property taxes, and for interest paid in connection with the mortgages.

[*10] IV.    <u>Corporate Spending</u>

A.    <u>Credit Card Usage</u>

During the years at issue petitioner maintained an American Express (AMEX) credit card, account ending x4001.  During 2004 through 2007 Mr. and Mrs. Hacker were authorized users of the credit card account.  Whitney was added as an authorized user in 2005 and Ashley in 2006.  In addition Mr. Hacker maintained an AMEX credit card, account ending x1009, on which he, Mrs. Hacker, and Ashley were authorized users.  Beginning in 2007 Mr. Hacker also maintained a Citi Cards (Citi) credit card account, on which he was the sole authorized user, and Mrs. Hacker maintained a Bank of America credit card, on which she was the sole authorized user.

The Hackers and their children used the credit cards to make purchases necessary to operate the daycare centers, but they also regularly used them to pay personal expenses.  During 2004 through 2007 the Hackers and their children charged thousands of dollars in personal expenses on petitioner's credit card account, as well as the Hackers' AMEX, Citi, and Bank of America credit cards, all of which petitioner invariably paid.  In addition to routine personal purchases, such as restaurant meals, auto expenses, and personal medical expenses, the Hackers either used the corporate credit card to pay or had petitioner pay their

[*11] personal credit cards for such expenses as college tuition, vacations, jewelry, and other luxury items. The Hacker children continued to make personal purchases with the credit cards even during periods when they were not employees of petitioner or Hacker Corp.

### B.  Vehicles

During the years at issue, Mr. Hacker drove a 2003 Hummer as his personal vehicle, while Mrs. Hacker primarily used a 2000 Lexus as her personal vehicle. Both vehicles were titled in the Hackers' names, but petitioner paid the notes on the vehicles and claimed depreciation deductions for them on its tax returns. In March 2004 petitioner traded in a Ford Expedition for $24,919 toward the purchase of a 2004 BMW, which was titled in Steven's name. Steven was the borrower on the car loan and used the BMW for commuting and other personal purposes. Similarly, beginning in April 2004 Ashley began driving a 2004 Cadillac Escalade as his personal vehicle. The Escalade was titled in Ashley's name and Ashley was the borrower on the car loan. Petitioner paid the notes on both Steven and Ashley's vehicles and claimed depreciation for those vehicles on its tax returns. Neither the Hackers nor their children maintained any mileage logs or other records of the extent, if any, to which they used the vehicles for petitioner's business purposes.

[*12] V.   Rental Property

In May 2005 petitioner purchased 839 Katy St., Sand Springs, Oklahoma (Katy St.) from a third party for $50,000 and executed a promissory note and mortgage on the property for $42,500.  Beginning in June of that year, petitioner rented the property to a tenant and received monthly rent payments.  The payments totaled $4,200, $7,200, and $6,767 for 2005, 2006, and 2007, respectively.

Petitioner did not report the Katy St. property rent payments on its returns.  Rather, Hacker Investment, LLC (Hacker Investment), reported them on its returns.  Mr. and Mrs. Hacker formed Hacker Investment as an Oklahoma limited liability company in 2002.  During the years at issue Hacker Investment was treated as a partnership for Federal tax purposes, and its principal business activity was leasing real estate.  Petitioner was not a member of Hacker Investment.

VI.   Bookkeeping and Return Preparation

A.   Deposit Summaries

During 2004 through 2008 each of petitioner's daycare centers maintained computer records of payments received from parents.  The records were maintained by the director or assistant director of each daycare center, who recorded each payment amount and whether the payment was by check, cash, or "other" (e.g., money order).  Each daycare center ran a daily printout of the

[*13] records, reconciled the report with the payments, and transmitted the report and the payments to Mr. Hacker. Mr. Hacker would review and verify the information, then deposit the checks, money orders, and a portion of the cash into petitioner's bank account.

### B. Bookkeeping

#### 1. Rob Crowder

Before December 2007 petitioner did not have an in-house bookkeeper. Rather, petitioner engaged the services of Walters & Bailey, C.P.A., Inc. (Walters & Bailey) for bookkeeping and tax return preparation. Rob Crowder, a certified public accountant performing independent contract work for Walters & Bailey, prepared petitioner's general ledgers and financial statements, which would serve as the basis for its tax returns for 2004, 2005, and 2006.

Mr. Crowder prepared petitioner's general ledgers and financial statements using information the Hackers provided. They gave him bank statements from petitioner's operating, payroll, and loan accounts but failed to provide any records relating to undeposited cash or other payments. The Hackers also provided credit card statements for the AMEX credit card accounts ending x1009 and x4001 but did not provide Mr. Crowder with any guidance as to which expenditures were business expenses and which were personal. Although the Hackers and their

[*14] children used the credit cards for both business purchases and personal expenditures, the Hackers did not categorize their business expenses or notate the statements to indicate which purchases were personal. Similarly, the checks reflected on petitioner's bank statements were not coded as to whether they related to a business expense or a personal expense.

Despite the lack of guidance from the Hackers, Mr. Crowder determined that many of the expenses on the credit card statements were personal, and used a general ledger account entitled "A/R - Officer" as a catch-all for credit card charges that he determined were the Hackers' personal expenses. From 2004 to 2006 petitioner's "A/R - Officer" general ledger account increased from $208,776.22 to $1,379,408.30 based primarily on account of charges to the AMEX credit cards.

2. Bonnie King

In December 2007 petitioner hired Bonnie King to perform in-house bookkeeping and accounting functions, including the preparation of its general ledger and financial statements for 2007. Ms. King prepared the general ledger using petitioner's 2007 bank statements from its operating, payroll, and loan accounts, but, as with Mr. Crowder, the Hackers did not provide any information regarding the undeposited cash or other payments. Ms. King prepared general

[*15] ledgers that included the posting of payments of charges on the two AMEX credit card accounts, as well as the Bank of America credit card and the Citi credit card. The Hackers did not notate which expenditures were personal and which were business. Ms. King posted the majority of the credit card expenditures to petitioner's general ledger Supplies account and the remainder to Food and Activities. Like Mr. Crowder, Ms. King posted in the "A/R - Officer" account those expenses that appeared to be personal.

C.     Return Preparation

Petitioner's 2004 through 2007 tax returns were prepared by Walters & Bailey. Typically, each return was prepared by Michael Bailey and reviewed by Patrick Walters, who would meet with Mr. Hacker to sign the return. Mr. Bailey would prepare the returns using the general ledgers and financial statements Mr. Crowder or Ms. King prepared. The returns Walters & Bailey prepared claimed deductions for the expenses as posted in petitioner's general ledger and reported among its Current Assets on Schedule L, Balance Sheets per Books, attached to its Form 1120, U.S. Corporation Income Tax Return, "Note Rec Officer" the amounts believed to be personal expenditures. The Hackers never made any repayment of the amount designated as a loan nor did petitioner pay the Hackers any wages or

[*16] salary, and the reported amount increased from $236,189 at the beginning of 2004 to $1,332,066 at the end of 2007.[5]

Petitioner filed its income tax returns for 2004, 2005, 2006, and 2007, on September 15, 2005; September 15, 2006; September 15, 2007; and October 27, 2008, respectively.

VII. Examination

Respondent examined petitioner's tax returns for 2004, 2005, 2006, and 2007 in an examination that also covered the Hackers' personal tax returns for 2004 through 2008 and petitioner's worker classification of the Hackers for 2005 through 2007. Beginning in March 2008, a timely series of Forms 872, Consent to Extend the Time to Assess Tax, were subsequently executed on behalf of petitioner for 2004, 2005, 2006, and 2007. After a lengthy examination, respondent determined deficiencies of $70,239, $109,813, $109,557, and $130,967 for 2004, 2005, 2006, and 2007, respectively. The deficiencies were based on the following adjustments:

---

[5]The difference between the the $1,379,408 "A/R - Officer" shown on petitioner's general ledger and the $1,332,066 shareholder loan reported on petitioner's 2006 return stems from a book adjustment. The Hackers did not make any payment toward the reported balance.

| [*17]    Item | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|
| a. Rental expenses | --- | $136,652 | --- | --- |
| b. Depreciation | $56,374 | 26,708 | $20,820 | $51,415 |
| c. Management fees | 187,500 | 84,250 | 67,784 | --- |
| d. Compensation of officers | --- | --- | 100,000 | --- |
| e. Gross receipts | (203,659) | (314,797) | 160,701 | 18,888 |
| f. Interest expense | 12,917 | (43,245) | 17,963 | 17,359 |
| g. Rental profit -- Katy St. | --- | 2,997 | 5,284 | 4,851 |
| h. Legal and professional | --- | --- | 2,000 | --- |
| i. Repairs and maintenance | 1,674 | 38,775 | 23,946 | 27,700 |
| j. Wage reduction for Indian employment credit | (26,400) | (24,259) | (39,283) | (31,752) |
| k. Wages to shareholders | (198,740) | (209,200) | (220,210) | (231,800) |
| l. Nonbusiness deducted expenses | 278,556 | 360,405 | 48,324 | 21,830 |
| m. Interest income | --- | --- | (73,638) | (75,796) |
| n. Supplies | --- | --- | --- | 436,408 |
| o. Sale of property -- Sch. D | 58,980 | 128,468 | --- | --- |
| p. Contributions | 2,266 | --- | --- | --- |
| q. Bank charges | --- | --- | --- | 1,551 |
| r. Insurance expenses | --- | --- | --- | 14,506 |
| Total adjustments | 169,468 | 186,754 | 113,691 | 255,160 |

[*18] In addition respondent determined civil fraud penalties under section 6663 of $52,679.25, $82,359.75, $82,167.75, and $98,225.25 for the years at issue. Respondent additionally determined that petitioner is liable for an addition to tax pursuant to section 6651(a)(1) for 2007 of $32,741.75.

Respondent issued the notice of deficiency on November 14, 2011, and petitioner timely filed the petition docketed as No. 3868-12.

OPINION

I.     Burden of Proof

Generally, the Commissioner's determinations set forth in a notice of deficiency are presumed correct, and the taxpayer bears the burden of showing the determinations are in error. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). When, as here, a case involves unreported income, the U.S. Court of Appeals for the Tenth Circuit, to which this case would be appealable absent a stipulation to the contrary, see sec. 7482(b); Golsen v. Commissioner, 54 T.C. 742, 757 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971), has held that the Commissioner's determination of unreported income is entitled to a presumption of correctness once some substantive evidence is introduced demonstrating that the taxpayer received unreported income, United States v. McMullin, 948 F.2d 1188, 1192 (10th Cir. 1991). Once the Commissioner introduces some substantive evidence

[*19] linking the taxpayer to the income, the presumption of correctness applies, and the burden shifts to the taxpayer to produce substantial evidence overcoming it. Id.

II.     Adjustments to Gross Receipts

Respondent determined that petitioner had unreported gross receipts of $160,701 and $18,888 for 2006 and 2007, respectively. Respondent additionally determined that petitioner is entitled to downward adjustments of $203,659 and $314,797 to its gross receipts for 2004 and 2005, respectively.

Gross income means all income from whatever source derived, including income derived from business. See sec. 61(a)(2). Gross income is construed broadly to include all "accessions to wealth, clearly realized, and over which the taxpayers have complete dominion." Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955). Every person subject to income tax is required to maintain books and records sufficient to establish the amount of gross income and deductions shown by that person on his or her income tax return. See sec. 6001; sec. 1.6001-1(a), Income Tax Regs.

Bank deposits are prima facie evidence of income. Tokarski v. Commissioner, 87 T.C. 74, 77 (1986); Bolles v. Commissioner, T.C. Memo. 2019-42, at *14. The bank deposits method of proof assumes that all deposits into

**[*20]** a taxpayer's bank account during a given period constitute taxable income unless the taxpayer can show that the deposits are nontaxable. Clayton v. Commissioner, 102 T.C. 632, 645 (1994). The Government must take into account any nontaxable source or deductible expense of which it has knowledge. DiLeo v. Commissioner, 96 T.C. 858, 868 (1991), aff'd, 959 F.2d 16 (2d Cir. 1992).

On its returns petitioner reported gross receipts from its daycare centers of $2,473,118, $2,864,239, $2,766,247, and $2,718,796 for 2004, 2005, 2006, and 2007, respectively. Revenue Agent Floyd (RA Floyd) conducted a bank deposits analysis of petitioner's bank accounts and concluded that, after taking into account transfers and funds from nontaxable sources, petitioner's net taxable deposits totaled $2,222,011.01, including cash deposits of $2,641, for 2004; $2,494,602.77, including cash deposits of $23,984, for 2005; $2,840,718.99, including cash deposits of $4,985, for 2006; and $2,737,684.37, including cash deposits of $5,180, for 2007.

Because petitioner's returns were prepared solely on the basis of petitioner's bank statements, RA Floyd compared the cash amounts deposited into petitioner's bank accounts against the total deposit summaries. On the basis of discrepancies between cash received and cash deposited, RA Floyd found that Mr. Hacker failed

**[\*21]** to deposit cash payments totaling $47,448.31, $54,839.25, $86,228.74, and $88,767.78 for 2004, 2005, 2006, and 2007, respectively.

Petitioner does not argue that respondent's use of the bank deposits analysis is erroneous or that any specific deposit included in respondent's determination was from a nontaxable source. Nor does petitioner dispute that it received undeposited cash payments. At trial Mr. Hacker testified that he did not believe that the total deposit summaries were reliable, citing the possibility of duplicate entries or mislabeling cash as checks or vice versa. Three of petitioner's daycare center directors testified, however, about the procedures and safeguards the company followed to ensure the accuracy of the daily deposit summaries and that the entries matched the amounts actually received. Petitioner does not identify any specific erroneous entry that should not be included in gross receipts.

In summary, respondent determined that petitioner overreported gross receipts for 2004 and 2005 but also underreported cash received the same years, for a net decrease of $203,659 for 2004 and $314,797 for 2005. Respondent also determined that petitioner underreported gross receipts for 2006 and 2007 and underreported cash received for an increase of $160,701 for 2006 and $18,888 for 2007. The Court holds that petitioner has failed to satisfy its burden of proof. Respondent's adjustments to petitioner's gross receipts are sustained.

[*22] III.     Capital Gain Adjustments

   A.     2004 Adjustments

Respondent determined an increase in petitioner's capital gain income for 2004 of $58,980. Of that amount, $39,676 relates to recapture of prior-year excess depreciation on two vehicles, a 2002 Nissan and a 2003 Hummer, and $19,304 relates to gain on the trade-in of a Ford Expedition.

   1.     Recapture of Excess Depreciation[6]

Section 167(a) allows as a depreciation deduction a reasonable allowance for the exhaustion, wear, and tear (including a reasonable allowance for obsolescence) of property used in a trade or business or held for the production of income. Section 168(a) specifies that the amount allowed as a depreciation deduction under section 167(a) is determined by using the applicable depreciation method, the applicable recovery period, and the applicable convention.

Section 280F limits the allowable depreciation deduction where listed property, including any passenger automobile or any other property used as a means of transportation, is not predominantly used in a qualified business use. Sec. 280F(b)(1), (d)(4)(A)(i) and (ii). As a general rule, where any listed property

---

[6]Respondent characterizes the depreciation recapture as capital gain income, and petitioner does not dispute that characterization. The Court proceeds accordingly.

[*23] is not predominantly used in a qualified business use for the taxable year, the general depreciation method of section 168(b)(1) (i.e., double declining, switching to straight line depreciation) is not used. See sec. 280F(b)(1). Rather, the alternative depreciation system of section 168(g) (i.e., the straight-line method) is used to compute the allowable depreciation deduction. See secs. 280F(b)(1), 168(g)(1) and (2). Moreover, where the qualified business use of any listed property falls to 50% or less, the taxpayer is required to include excess depreciation in gross income (recapture) for the taxable year in which the property is first not predominantly used in a qualified business use. Sec. 280F(b)(2)(A). The term "excess depreciation" means the excess, if any, of (1) the amount of depreciation deductions allowed when the property was predominantly used in a qualified business use over (2) the amount of depreciation deductions that would have been allowed if the property had not been predominantly used in a qualified business use for the taxable year in which it was placed in service. Sec. 280F(b)(2)(B). Property is treated as predominantly used in a qualified business use if the business use for the year exceeds 50%. Sec. 280F(b)(3). The term "qualified business use" generally means any use in the taxpayer's trade or business. Sec. 280F(d)(6)(B).

[*24] On the depreciation schedule attached to petitioner's 2004 Form 1120, petitioner claimed depreciation deductions for a 2002 Nissan and a 2003 Hummer, both of which are either a passenger vehicle or other property used as a means of transportation and therefore listed property under section 280F(d)(4)(A). Respondent determined that, pursuant to section 280F(b), petitioner was entitled to straight-line depreciation deductions of $2,200 and $5,500 in connection with the 2002 Nissan and the 2003 Hummer, respectively, for 2004 because petitioner did not use the vehicles predominantly in a qualified business use. Petitioner reported prior-year depreciation deductions of $10,710 in connection with a 2002 Nissan and $36,666 relating to a 2003 Hummer,[7] both of which were put into service in 2003. Accordingly, respondent determined excess depreciation for 2004 of $8,510 and $31,166, for the 2002 Nissan and the 2003 Hummer, respectively.

Petitioner did not introduce any evidence that either the 2002 Nissan or the 2003 Hummer was predominantly used in a qualified business use during 2004. Petitioner claimed 100% business use for the 2003 Hummer. At trial, however, Mr. Hacker testified that he used the 2003 Hummer during the years at issue for commuting and other personal purposes. No evidence was introduced to

---

[7]Petitioner's claimed depreciation relating to the 2003 Hummer included $27,500 in bonus depreciation pursuant to sec. 168(k)(4).

[*25] demonstrate what percentage of Mr. Hacker's use of the vehicle was for a qualified business use, rather than personal use. Nor did petitioner submit any evidence that the 2002 Nissan was predominantly used in a qualified business use. Accordingly, respondent's determination with respect to the vehicles is sustained.

2.    Vehicle Trade-In

Respondent additionally determined that petitioner failed to report capital gain of $19,304 in connection with the trade-in of a Ford Expedition.

Section 311(a) generally provides that no gain or loss shall be recognized by a corporation on the distribution of property. Where a corporation distributes appreciated property to a shareholder, however, section 311(b)(1) provides that the corporation recognizes gain as if the property were sold to the shareholder at its fair market value. See, e.g., Bross Trucking, Inc. v. Commissioner, T.C. Memo. 2014-107, at *15. Gain is recognized to the extent that the property's fair market value exceeds the corporation's adjusted basis. Sec. 311(b)(1); see also Bross Trucking, Inc. v. Commissioner, at *15.

In 2004 petitioner traded in the Ford Expedition toward a 2004 BMW with a trade-in value of $24,919. The BMW and the loan were in Steven Hacker's name, and he used it as his personal vehicle. Respondent determined that the trade-in

[*26] constituted a distribution to shareholders and on the basis of a reported basis of $5,615, calculated the gain on the trade in to be $19,304.

Petitioner disagrees with respondent's determination but offers no argument or evidence in support of its position. Petitioner has not demonstrated that the trade-in value of the Ford Expedition was less than respondent's determination, or that petitioner's adjusted basis in the Ford Expedition was greater. Petitioner has not introduced any evidence to show that the trade-in of the Expedition for the 2004 BMW, which was titled in Steven's name and used exclusively by him, was not a distribution. Respondent's adjustment is sustained.

B.     2005 Adjustment -- Real Property Transfers

Respondent determined that petitioner failed to report capital gain income of $128,468 on the transfer of real property to Hacker Corp. in 2005. Before the transfers, petitioner or the Hackers owned the six properties on which petitioner operated its daycare centers. In May 2005 petitioner and the Hackers transferred those properties by quitclaim deed to Hacker Corp. Respondent determined that the transfer constituted a distribution of property to shareholders and, pursuant to section 311(b)(1), petitioner must recognize gain to the extent that the fair market values of the properties exceed petitioner's adjusted bases in the properties.

[*27] The Court sustains respondent's determination in part. With respect to the Long St. and Mingo Rd. properties, the Court finds that no property distribution occurred because petitioner neither directly owned those properties nor attempted to transfer them. Rather, the Tulsa County property records show that Mr. and Mrs. Hacker, as individuals, held title to the Mingo Rd. property from June 1996 until they executed the quitclaim deed to Hacker Corp. in May 2005. Similarly, Mr. and Mrs. Hacker, as individuals, were the owners of the Long St. property, and they transferred it to Hacker Corp. The Hackers, and not petitioner, transferred the properties to Hacker Corp., and the deeds of transfer are signed in their individual capacities. Section 311 is inapplicable.

The Court now turns to the remaining four properties. Petitioner contends that no gain or loss should be recognized because each transfer was "a transfer of 'bare naked title' only" with petitioner "retaining most, if not all of the benefits and burdens of ownership of the real property." According to petitioner, "[a] legal or equitable transfer of buildings from Blossom to Hacker Corporation did not occur" and "the arrangement between Blossom and Hacker Corporation would not withstand scrutiny under the Oklahoma Uniform Fraudulent Transfer Act * * * nor the scrutiny of the Internal Revenue Service in a collection action."

**[\*28]** Petitioner's argument is without merit. In determining whether passage either of title or of the benefits and burdens has occurred, the Court looks to State law, in this case, to the law of Oklahoma. See United States v. Nat'l Bank of Commerce, 472 U.S. 713, 722 (1985); Keith v. Commissioner, 115 T.C. 605, 611 (2000). It is State law that creates and governs the nature of interests in property, while Federal law controls the manner in which such interests are taxed. Keith v. Commissioner, 115 T.C. at 611. With respect to real property, a sale or transfer of ownership is complete upon the earlier of the passage of legal title or the practical assumption of the benefits and burdens of ownership. Id.; Belden v. Commissioner, T.C. Memo. 1995-360, 1995 WL 454150, at \*3-\*4 (citing Oklahoma caselaw).

In the present case petitioner transferred legal title as well as the benefits and burdens of ownership. Petitioner conveyed the properties to Hacker Corp. in writing by quitclaim deeds on May 2, 2005, and the deeds were duly filed in the Tulsa County land records. See Okla. Stat. title 16, secs. 4, 15 (2005). Under Oklahoma law, a quitclaim deed made in substantial compliance with the requirements of title 16, chapter 1 of the Oklahoma Statutes conveys all right, title, and interest of the grantor of the land. Id. sec. 18; see also id. secs. 40 and 41 (2005); Beattie v. State ex rel. Grand River Dam Auth., 41 P.3d 377, 380 (Okla.

**[\*29]** 2002). Petitioner does not allege, and the evidence does not show, that petitioner's quitclaim deeds failed to comply with the formal requirements of Oklahoma property law.

Hacker Corp. assumed from petitioner the benefits and burdens of ownership. Factors indicating the benefits and burdens of ownership include: (1) a right to possession; (2) an obligation to pay taxes, assessments, and charges against the property; (3) a responsibility for insuring the property; (4) a duty to maintain the property; (5) a right to improve the property without the seller's consent; (6) a bearing of the risk of loss; and (7) a right to obtain legal title at any time by paying the balance of the full purchase price. Keith v. Commissioner, 115 T.C. at 611-612. When a buyer, by virtue of such incidents, would be considered to have obtained equitable ownership under State law, a sale will generally be deemed completed for Federal tax purposes. Id. at 612.

Beginning in May 2005 Hacker Corp., and not petitioner, carried the benefits and burdens of ownership. In addition to holding legal title, Hacker Corp. paid the mortgages and property tax payments associated with the properties and claimed deductions on its tax returns for depreciation, mortgage interest, and State taxes. Petitioner maintained possession of the properties, but began making rent payments to Hacker Corp. While it is true that no written rental agreements were

**[\*30]** entered into and petitioner did, at times, make payments directly to the mortgage holder, such payments do not outweigh the other factors indicative of transfers.

Moreover, it is well established that taxpayers are ordinarily bound by the form of their transactions, while the government can attack that form if it does not represent the substance of the transaction. Newhall Unitrust v. Commissioner, 104 T.C. 236, 243 (1995), aff'd, 105 F.3d 482 (9th Cir. 1997). While taxpayers are free to organize their affairs as they choose, once they have done so, they must accept the tax consequences of the choice, whether contemplated or not. Commissioner v. Nat'l Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 149 (1974); CMI Int'l, Inc. v. Commissioner, 113 T.C. 1, 4 (1999) ("Generally, taxpayers are bound to the form of their transaction."). There is no question that petitioner intended to transfer, and Hacker Corp. intended to receive, ownership of the real properties. The parties' failure to adhere to formalities should not provide an opportunity to repudiate the clear intentions of the parties post hoc when faced with adverse tax consequences. See Hill v. Commissioner, T.C. Memo. 2010-268, slip op. at 15.

Petitioner's reference to the Oklahoma Uniform Fraudulent Transfer Act is also misplaced. That statute provides certain remedies, including voidability of

[*31] the transfer, to creditors of the transferor. See, e.g., Okla. Stat. title 24, secs. 119 and 120 (2005). The purpose of that Act is to allow a creditor the opportunity to invalidate the transfer of assets made by a debtor if the transfer has the effect of placing assets out of the reach of present and future creditors. Burrows v. Burrows, 886 P.2d 984, 988 (Okla. 1994). Petitioner, as the transferor, may not avail itself of the Act's benefits to escape the adverse consequences of its decisions. Petitioner chose to structure its affairs in the manner it did; it has not demonstrated why it should not be held to the form of the transactions that it deliberately chose. See Messina v. Commissioner, T.C. Memo. 2017-213, at *44, aff'd, 799 F. App'x 466 (9th Cir. 2019).

The Court holds that petitioner failed to report capital gain with respect to the transfers of the properties at 81st West Ave.; 76th St. North; East 61st St.; and Elm Pl. Respondent's determination with respect to those properties is sustained.

IV.    Rental Income

Gross income includes rents. Sec. 61(a)(5). During 2005, 2006, and 2007 petitioner received, but did not report, rent payments from the Katy St. property. Rather, Hacker Investment reported receiving income from a number of rental properties on its returns for those years, including the Katy St. property, and the Hackers reported the rental income on Schedule E attached to their tax returns.

**[\*32]** Relying on spreadsheets maintained by Hacker Investment, respondent determined that petitioner's gross rents from the Katy St. property were $4,200, $7,200, and $6,767 for 2005, 2006, and 2007, respectively. After allowing deductions for depreciation, respondent determined that petitioner received net income of $2,997, $5,284, and $4,851 for 2005, 2006, and 2007, respectively. Petitioner has not introduced any evidence or argument to rebut respondent's determination. Respondent's determination of rental income from the Katy St. property is sustained.

V.     Disallowed Deductions

Section 162(a) allows a deduction for all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. Deductions are a matter of legislative grace, and petitioner has the burden of establishing entitlement to any claimed deductions. See INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); Le v. Commissioner, T.C. Memo. 2020-27, at \*26; see also Rule 142(a). Section 6001 requires every person subject to income tax to maintain books and records sufficient to establish the amount of gross income and deductions shown on its income tax return. See also sec. 1.6001-1(a), Income Tax Regs.

**[*33]** A.    Depreciation Expenses

On its returns, petitioner claimed depreciation expense deductions of $247,730 for 2004, $100,303 for 2005, $37,627 for 2006, and $59,501 for 2007. Respondent disallowed depreciation with respect to certain assets as follows:

| Asset | 2004 | 2005 | 2006 | 2007 |
|-------|------|------|------|------|
| Depreciation disallowed | | | | |
| 2000 Ford F350 | $1,669 | $1,775 | $1,775 | $1,775 |
| 2001 Ford Explorer | 1,775 | 1,775 | 1,775 | 1,775 |
| 2000 Lexus | 2,950 | 1,775 | 1,775 | 1,775 |
| 2002 Nissan | 4,900 | 1,672 | 837 | 1,775 |
| 2003 Hummer | 12,221 | 4,073 | 2,040 | --- |
| 2/2/04 Auto | 8,635 | 2,878 | 959 | 481 |
| 3/15/04 Auto (2004 BMW) | 10,610 | 4,800 | 2,850 | 1,675 |
| 4/29/04 Auto (2004 Cadillac Escalade) | 10,610 | 4,800 | 2,850 | 1,675 |
| 3/1/05 Auto | --- | 3,160 | 4,700 | 2,850 |
| Ford F150 | --- | --- | 1,259 | 9,237 |
| 10/1/07 Bus (2003 Intruder 369 recreational vehicle) | --- | --- | --- | 28,397 |
| Depreciation adjusted | | | | |
| Elm Pl. (land) | 3,004 | --- | --- | --- |
| Total | 56,374 | 26,708 | 20,820 | 51,415 |

[*34] Section 167(a) allows as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear of property used in a trade or business or held for the production of income. To substantiate entitlement to a depreciation deduction, a taxpayer not only must show that the property was used in a business but also must establish the property's depreciable basis by showing the cost of the property, its useful life or recovery period, and its previously allowable depreciation. See, e.g., Cluck v. Commissioner, 105 T.C. 324, 337 (1995); WSK & Sons, Inc. v. Commissioner, T.C. Memo. 2015-204, at *11-*12.

A taxpayer may alternatively elect to treat the cost of certain property used in an active trade or business as a current expense in the year that the property is placed in service. Sec. 179(a), (d). If the property is used for both business and other purposes, then the portion of the cost that is attributable to the business use is eligible for expensing under section 179 only if more than 50% of the use is for business purposes. See sec. 1.179-1(d), Income Tax Regs.

With respect to certain items, including passenger automobiles and any other property used as a means of transportation, section 274(d) establishes heightened substantiation requirements that must be met to establish business use. See also sec. 280F(d)(4). In the case of such property the taxpayer must substantiate by adequate records or sufficient evidence corroborating the

[*35] taxpayer's own statement the amount, time, place and business purpose of the expense. Sec. 274(d). No deduction is allowed for personal, living, or family expenses. Sec. 262(a).

Respondent contends that petitioner has failed to show its entitlement to the depreciation on the vehicles above (claimed vehicle depreciation) because petitioner has not established each vehicle's basis, useful life, ownership, or business purpose. Petitioner concedes on brief that it is not entitled to the claimed depreciation deductions for the "2/2/04 Auto" or for the land. With respect to the remaining claimed vehicle depreciation, petitioner disagrees with respondent's adjustments but offers little in the way of argument to establish its entitlement thereto.

Petitioner has failed to demonstrate its entitlement to the claimed vehicle depreciation. Petitioner did not maintain mileage logs or any other records in connection with its use of the vehicles reported on its depreciation schedules. Indeed, many of the vehicles, including the 2000 Lexus, the 2003 Hummer, the 2004 BMW, and the 2004 Cadillac Escalade, were the personal vehicles of the Hackers or their children. No documentation or corroborating evidence was submitted in support of the Hackers' claims that the vehicles were used 100% for business use, and the Hackers themselves acknowledged that they and their

[*36] children used them for commuting and other personal activities. With respect to the remaining vehicles, petitioner has offered no evidence to support its entitlement to the claimed depreciation. Respondent's disallowance of the depreciation expense deductions is sustained.

B.     Disallowed Business Expense Deductions

Respondent determined that petitioner was not entitled to various claimed business expense deductions totaling $278,556, $360,405, $48,324, and $21,830 for 2004, 2005, 2006, and 2007, respectively, because the reported expenses were not established as business expenses or were personal. Respondent disallowed reported expenses for food, activities, supplies, office, automobile, travel, and meals and entertainment. Such expenditures, respondent determined, were not business expenses and should be reclassified as constructive dividends to the Hackers.

As discussed above, section 162(a) allows a deduction for all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. An ordinary and necessary expense is one which is appropriate and helpful to the taxpayer's business and results from an activity that is a common and accepted practice in the business. Amdahl Corp. v. Commissioner, 108 T.C. 507, 523 (1997); Krist v. Commissioner, T.C. Memo. 2001-140, slip op.

**[\*37]** at 6. Whether a payment qualifies for a deduction under section 162(a) is a factual issue which must be decided on the basis of all relevant facts and circumstances. Commissioner v. Heininger, 320 U.S. 467, 475 (1943). Petitioner bears the burden of proving its entitlement to the disallowed expense deductions. See Rule 142(a); Welch v. Helvering, 290 U.S. at 115. Section 274(d) disallows any deduction for any traveling expense or for listed property, including automobile expenses, unless the taxpayer substantiates by adequate records or sufficient evidence corroborating the taxpayer's own statement the amount, time, place, and business purpose of the expense. No deduction is allowed for personal, living, or family expenses. Sec. 262(a).

Petitioner argues that respondent arbitrarily disallowed deductions for all expenditures made by credit card, other than payments to wholesale food distributors U.S. Food Service, Sysco, and Fadler, for each year. Petitioner explains at great length on brief why the general ledger and spreadsheets relied upon by its return preparers were incorrect, miscategorized purchases, did not match perfectly with petitioner's credit card statements, or were otherwise wrong. Petitioner argues that "the only explanation provided by [r]espondent" is that expenditures "have not been verified as business expense" and spends

**[\*38]** considerable portions of its brief listing the charges on its credit cards during the years at issue.

Petitioner misunderstands the burden of proof in this case. Determinations set forth in the notice of deficiency are presumed correct. A taxpayer is required to maintain books and records adequate to establish entitlement to deductions claimed. Sec. 6001; sec. 1.6001-1(a), Income Tax Regs. It is petitioner's burden to demonstrate its entitlement to the deductions claimed on the returns, including that each expense was paid and that it was an ordinary and necessary business expense. In large part, petitioner has failed to do so. There is no dispute that the Hackers and their children incurred the charges on the credit card statements, or that petitioner paid those charges and claimed deductions for the purchases on its returns. What petitioner fails to provide, however, is substantiation of what the charges represented or their business purpose.

Moreover, respondent's determinations were not arbitrary. Rather, the record shows, and petitioner has acknowledged, that the Hackers and their children routinely charged personal expenses to their credit cards, which were then paid by petitioner, and either posted on petitioner's general ledgers or claimed as deductions on its returns. Among those expenses were the Hackers' personal vehicles, meals, college tuition, jewelry, vacations, holiday decorations for the

**[\*39]** Hackers' personal residence, and even their son's wedding. Petitioner deducted credit card charges made by the Hacker children even during periods when they were not paid employees. Such expenses are inherently personal and nondeductible. See sec. 262(a).

Further, the Hackers did not adequately substantiate any of petitioner's reported expenses. They did not notate the credit card statements to indicate which charges were business expenses and which were personal or provide receipts or any additional information regarding the purchases. In the case of the reported automobile and travel expenses, they did not provide any of the required information to meet the heightened substantiation requirements of section 274(d). In the absence of such evidence the Court cannot assess whether and to what extent the purchases were ordinary and necessary business expenses.

Nevertheless, the Court is persuaded that petitioner did pay expenses associated with the running of its six daycare centers during the years at issue above the amounts respondent allowed. When a taxpayer establishes that it has paid deductible expenses but is unable to substantiate the exact amounts, the Court may estimate the deductible amount, bearing heavily upon the taxpayer whose inexactitude is of its own making. See Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930).

[*40] Mrs. Hacker testified that the daycare centers provided its students with two or three meals each day, as well as an afternoon snack. Much of the food was provided by wholesalers or other suppliers, such as Sysco, U.S. Food Service, or Fadler, and respondent allowed deductions for those purchases. A director at one of petitioner's daycare centers testified that it was not uncommon for a daycare center to run low or require additional food, however, and employees were frequently required to make trips to the grocery store to pick up additional items. The Court found the employees' testimony credible and will allow petitioner the additional claimed deductions from grocery stores totaling $84,905 for 2004 and $74,010 for 2005.

Similarly, the Court is persuaded that petitioner paid activity expenses during the years at issue. On brief, petitioner identifies a list of credit card charges totaling $11,700.74 for 2004 and $9,661.47 for 2005 that, petitioner alleges, represent activity expenses for those years. Upon consideration, the Court will allow additional activity expenses of $10,547.59 for 2004 and $9,661.47 for 2005. Those amounts reflect total purchases from businesses specializing in early education or childcare-related equipment, activities, or materials, while disallowing purchases from stores such as K-Mart and Wal-Mart, which may contain some personal element. It is clear that the amounts allowed were not

[*41] personal but represent ordinary and necessary expenses related to operating a daycare center.

Accordingly, the Court finds that petitioner is entitled to additional business expense deductions totaling $95,452.59 for 2004 and $83,671.47 for 2005. The remainder of respondent's determination is sustained.

C.    Management Fees

Petitioner claimed deductions for management fees in connection with its payments to Hacker Corp. for services the Hackers and their children rendered and, beginning in May 2005, for the use of the properties. On its returns petitioner claimed deductions of $309,300, $342,650, and $378,484 for 2004, 2005, and 2006, respectively. Respondent reviewed petitioner's general ledger and bank accounts and determined that petitioners paid management fees of $121,800, $258,400, and $310,700 for 2004, 2005, and 2006, respectively, on the basis of checks from petitioner to Hacker Corp. but disallowed the remaining amounts on the basis that no substantiation or explanation was provided regarding those amounts.

Petitioner objects to respondent's adjustments, arguing, essentially, that respondent failed to include certain management fee payments to Hacker Corp. Petitioner credibly maintains that the management fees paid to Hacker Corp. were

**[\*42]** Hacker Corp.'s only source of income during the years at issue and that all of the fees petitioner deducted on its returns were reported as gross receipts by Hacker Corp. Yet while respondent allowed deductions of $121,800, $258,400, and $310,700 for 2004, 2005, and 2006, respectively, respondent also adjusted the gross receipts of Hacker Corp. to $125,850, $304,463, and $370,626 for the same years, respectively.

Petitioner's position is supported by the evidence. A review of petitioner's bank statements, as well as respondent's analysis of Hacker Corp.'s bank deposits, reveals that respondent failed to take into account checks from petitioner totaling $4,050, $12,400, and $1,100 for 2004, 2005, and 2006, respectively. In addition respondent did not consider Hacker Corp. cash deposits totaling $11,850 in 2005 and $2,600 in 2006. Mr. Hacker testified that petitioner was the only source of income for Hacker Corp. The Court finds Mr. Hacker's testimony credible on that point and finds that the cash payments to Hacker Corp. were from petitioner. Finally, respondent acknowledges that petitioner made one payment of $21,813 in 2005 and two payments of $21,813 in 2006 directly to Security Bank toward the mortgages on the properties it rented from Hacker Corp., in lieu of payments to Hacker Corp.

[*43] Accordingly, petitioner has established that it is entitled to additional deductions for management fees of $4,050, $46,063, and $47,326 for 2004, 2005, and 2006, respectively, in excess of those respondent allowed. The remaining portions of respondent's adjustments are sustained.

D.      Interest

Petitioner deducted interest expenses of $109,415, $18,607, $30,778, and $17,359 for 2004, 2005, 2006, and 2007, respectively. Respondent disallowed $12,917 of the claimed interest expense deductions for 2004, $17,963 for 2006, and $17,359 for 2007. Respondent determined an increase in interest paid for 2005 of $43,245 because, although respondent determined that petitioner was not entitled to certain claimed interest expense deductions for that year, petitioner was entitled to one-half of the interest paid on the notes on the real properties during 2005. Petitioner does not offer any argument or identify any evidence that respondent's adjustments are incorrect. Accordingly, the Court sustains respondent's disallowance of the claimed interest expense deductions.

E.      Repairs

On its returns petitioner deducted repair and maintenance expenses of $41,859, $109,793, $120,117, and $171,808 for 2004, 2005, 2006, and 2007, respecitvely. Of those amounts respondent disallowed $1,674, $38,775, $23,946,

[*44] and $27,700 for 2004, 2005, 2006, and 2007, respectively. For 2004 respondent determined that $1,673.77 was a personal expense paid for work on the Hackers' boat. For 2005 respondent disallowed repair expense deductions totaling $38,775, on the grounds that $9,535.74 was paid to Metro Construction, Inc. (Metro), in connection with work on property petitioner did not own; invoices could not be provided with respect to a payment of $9,700 to Metro; and $19,539 in reported expenses could not be substantiated. Similarly, for 2006 respondent disallowed a deduction for a payment to Metro of $10,875.12 because no invoice could be provided; and $10,875 in reported expenses could not be substantiated.[8] Respondent disallowed $27,700 of repair expense deductions for 2007 because of lack of substantiation.

In support of its entitlement to the claimed deductions, petitioner directs the Court only to entries on its general ledger or to credit card statements reflecting the amounts charged. Such entries do not establish the nature of the purchases or the business purpose of the items purchased. With the exceptions of the Metro invoices, several of which pertained to property owned by petitioner's shareholders or related entities, and of those amounts respondent conceded,

---

[8]Respondent has conceded that petitioner has substantiated $5,291 in additional expenses for 2006.

[*45] petitioner has not introduced corroborating evidence to support its claim that the disallowed repair expense deductions were for its ordinary and necessary expenses. Petitioner has not met its burden of proof. Respondent's determinations are sustained.

### F. Supplies

On its 2007 return petitioner claimed a deduction for supplies of $622,714. That amount included approximately 80% of all payments petitioner made to its credit card issuers in 2007, which Ms. King recorded as supplies expenses when preparing petitioner's general ledger and financial statements that served as the basis for petitioner's 2007 tax return. Respondent disallowed $436,408 of the claimed deduction. Of that amount respondent disallowed $271,867 of the $291,100 paid to petitioner's credit card issuers, which respondent determined was for personal expenses. The disallowed amount also included checks totaling $153,000 written to petitioner, a transfer of $6,541.24, a $500 check to Lola Shockley, a $2,500 check to Steven Hacker, and a $2,500 check to Mrs. Hacker, all of which were claimed as supplies expense deductions on petitioner's 2007 return.

As with the disallowed business expense deductions for 2004 through 2007, petitioner primarily argues that respondent's disallowance of the claimed

[*46] deductions was arbitrary and without a factual basis but fails to present evidence or argument regarding the business purpose of the majority of its expenditures or offer much in the way of differentiating between business and personal purchases. Petitioner does provide a list of purchases that it alleges were for food purchases for the students. As with the claimed food expense deductions for 2004 and 2005, the Court found the witnesses' testimony credible on this point and will allow an additional deduction for petitioner's grocery store purchases, totaling $23,023.57 for 2007. With respect to the remaining expenses, respondent's determinations are sustained.

VI.    Indian Employment Credit

Petitioner claimed Indian employment tax credits of $26,400, $24,259, $39,283, and $31,752 for 2004, 2005, 2006, and 2007, respectively.

Section 38 allows a taxpayer to claim against his tax a general business credit, equal to the sum of the current-year business credit, and business credit carryforwards and carrybacks carried to the taxable year. Sec. 38(a). The amount of the current year business credit includes, among other items, the Indian employment credit as determined under section 45A(a). Sec. 38(b)(10). Section 45A(a) provides that the amount of the Indian employment credit with respect to

**[*47]** any employer for any taxable year is an amount equal to 20 percent of the excess (if any) of--

(1) the sum of--

(A) the qualified wages paid or incurred during such taxable year, plus

(B) qualified employee health insurance costs paid or incurred during such taxable year, over

(2) the sum of the qualified wages and qualified employee health insurance costs (determined as if this section were in effect) which were paid or incurred by the employer (or any predecessor) during calendar year 1993.

Section 45A(b)(1) defines "qualified wages" as "any wages paid or incurred by an employer for services performed by an employee while such employee is a qualified employee." A "qualified employee" is defined in section 45A(c)(1) as any employee who is an enrolled member of an Indian tribe or the spouse of an enrolled member, substantially all of whose services for the employer during the period are performed within an Indian reservation, and whose principal place of abode during the period while performing the services is on or near the reservation in which the services are performed. See also Warbelow's Air Ventures, Inc. v. Commissioner, 118 T.C. 579, 582 (2002), aff'd, 80 F. App'x 16 (9th Cir. 2003).

[*48] Petitioner claimed Indian employment tax credits of $26,400, $24,259, $39,283, and $31,752 for 2004, 2005, 2006, and 2007, respectively, on the basis of claimed qualified wages of $132,001, $121,293, $196,417, and $158,758, respectively. On each return petitioner also reported that the sum of qualified wages and qualified employee health insurance costs paid during 1993 was zero. Respondent determined that petitioner paid qualified wages of $43,694, $48,452, $54,806, and $41,137 in 2004, 2005, 2006, and 2007, respectively, but disallowed the credits in their entirety on the basis that petitioner failed to substantiate that its qualified wages paid in the years at issue exceeded the qualified wages paid in 1993.

Petitioner bears the burden of establishing its eligibility for the tax credits. See Rule 142(a). At trial petitioner introduced into evidence copies of its Employers Quarterly Contribution Reports filed with the Oklahoma Employment Security Commission for all four quarters of 1993. The reports show total wages of $187,611.29 paid in 1993, as well as a largely illegible list of petitioner's employees and their wages paid each quarter. At trial Mr. Hacker testified that he recognized one individual from the 1993 list as an enrolled member of an Indian tribe. In addition, Mrs. Hacker, who is also an enrolled member of an Indian tribe, was identified as an employee in 1993, when she received wages totaling

[*49] $12,500.[9] No further testimony or other evidence was offered on whether any other employee was a qualified employee in 1993 or what the qualified wages of any such employees were. Indeed, Mr. Hacker acknowledged that, given the illegibility of many of the documents, he was unable to do so.

Nor has petitioner shown that it paid qualified wages in excess of the amounts respondent confirmed. At trial petitioner introduced documentation purporting to demonstrate that certain employees were qualified employees. Much of that evidence was duplicative, relating to employees previously determined by respondent to be qualified employees. None of the evidence demonstrated whether any additional employees met the requirements set forth at section 45A(c)(1).

Accordingly, petitioner has failed to show that its qualified wages paid in any of the years at issue exceeded the qualified wages paid in 1993. Respondent's determinations are sustained.

VII. Wage Adjustment

Respondent determined that petitioner is entitled to wage deductions of $198,740 for 2004, $209,200 for 2005, $220,210 for 2006, and $231,800 for 2007,

---

[9]Mrs. Hacker cannot be a qualified employee because she is a 51% owner of petitioner. See sec. 45A(c)(5)(B).

[*50] on the basis of respondent's determinations of wages paid to the Hackers for services they provided to petitioner. Respondent's wage determinations for 2005, 2006, and 2007 were considered in connection with the Notice of Determination of Worker Classification that was the subject of the case at docket No. 3869-12, decided at Blossom Day Care Ctrs., Inc. v. Commissioner, T.C. Memo. 2021-86. In that report the Court sustained respondent's determination that Mr. and Mrs. Hacker were employees of petitioner and that remuneration provided directly or indirectly to them constituted wages. The Court's reasoning in that case is equally applicable for 2004. Mr. and Mrs. Hacker provided substantial services to petitioner and, in exchange, received compensation in the form of money, property, and other direct and indirect benefits but failed to pay themselves reasonable wages. Petitioner has failed to show that the wages respondent determined are erroneous. The wage adjustments are sustained.

VIII. Addition to Tax and Penalties

A. Section 6651(a) Addition to Tax

Section 6651(a)(1) imposes an addition to tax for failure to timely file a Federal income tax return unless it is shown that the failure is due to reasonable cause and not due to willful neglect. The addition to tax is equal to 5% of the amount required to be shown as tax on the delinquent return for each month or

**[\*51]** fraction thereof during which the return remains delinquent, up to a maximum addition of 25% for returns more than four months delinquent. Sec. 6651(a)(1). A taxpayer is not liable for the addition to tax for failure to timely file if the untimeliness was due to reasonable cause and not due to willful neglect. Sec. 6651(a)(1); Higbee v. Commissioner, 116 T.C. 438, 447 (2001). The burden of proving reasonable cause and lack of willful neglect falls on the taxpayer.[10] Rule 142(a); United States v. Boyle, 469 U.S. 241, 249 (1985).

Petitioner's 2007 income tax return was due March 15, 2008. See sec. 6072(b). Petitioner filed that return on October 27, 2008, which is more than four months after the due date. Petitioner does not allege, and the evidence does not show, that its untimely filing was due to reasonable cause. Accordingly, petitioner is liable for the addition to tax under section 6651(a)(1) for 2007.

B. Penalties

1. Section 6663(a) Fraud Penalties

Respondent determined that petitioner is liable for section 6663 fraud penalties for the years at issue. A penalty equal to 75% will be imposed on any

---

[10]Sec. 7491(c), which shifts the burden of production to the Secretary in any court proceeding with respect to liability for any penalty, addition to tax, or additional amount, applies only to individuals. See also NT, Inc. v. Commissioner, 126 T.C. 191, 195 (2006).

[*52] part of the taxpayer's underpayment of Federal income tax that is due to fraud.  Sec. 6663(a).  Fraud is an intentional wrongdoing on the part of the taxpayer with the specific purpose of evading a tax believed to be owing.  Edelson v. Commissioner, 829 F.2d 828, 833 (9th Cir. 1987), aff'g T.C. Memo. 1986-223; DiLeo v. Commissioner, 96 T.C. at 874; Minchem Int'l, Inc. v. Commissioner, T.C. Memo. 2015-56, at *43, aff'd sub nom. Sun v. Commissioner, 880 F.3d 173 (5th Cir. 2018).  If any portion of the underpayment is attributable to fraud, the entire underpayment will be treated as attributable to fraud unless the taxpayer establishes by a preponderance of the evidence that part of the underpayment is not due to fraud.  Sec. 6663(b); see also Minchem Int'l, Inc. v. Commissioner, at *43-*44.

Respondent has the burden of proving fraud by clear and convincing evidence.  See sec. 7454(a); Rule 142(b).  To carry that burden of proof, respondent must show, for each year, that (1) an underpayment of tax exists and (2) some portion is attributable to fraud.  See Hebrank v. Commissioner, 81 T.C. 640, 642 (1983); Benavides & Co., P.C. v. Commissioner, T.C. Memo. 2019-115, at *31.  Fraud is a question of fact to be resolved upon consideration of the entire record.  DiLeo v. Commissioner, 96 T.C. at 874.  Fraud is never presumed and

[*53] must be established by independent evidence.  Minchem Int'l, Inc. v. Commissioner, at *45.

Petitioner failed to report items of income and claimed deductions to which it was not entitled for all years at issue, and an underpayment of tax therefore exists for each year.  The first element of the fraud penalty has thus been established.  The Court must next determine whether petitioner had the requisite fraudulent intent.  Because direct evidence of fraudulent intent is seldom available, fraud may be proven by circumstantial evidence and reasonable inferences drawn from the facts.  Niedringhaus v. Commissioner, 99 T.C. 202, 210 (1992); Benavides & Co., P.C. v. Commissioner, at *34.  The taxpayer's entire course of conduct may be indicative of fraudulent intent.  Benavides & Co., P.C. v. Commissioner, at *34.  A corporation acts only through its officers and cannot escape responsibility for their acts in that capacity.  DiLeo v. Commissioner, 96 T.C. at 875; Benavides & Co., P.C. v. Commissioner, at *35.  Whether petitioner's intent was fraudulent therefore depends upon the intent of Mr. and Mrs. Hacker, its only shareholders and officers.

Circumstances that may indicate fraudulent intent, commonly referred to as "badges of fraud," include but are not limited to (1) understating income; (2) maintaining inadequate records; (3) giving implausible or inconsistent

[*54] explanations; (4) concealing income or assets; (5) failing to cooperate with authorities; (6) engaging in illegal activities; (7) providing incomplete or misleading information to one's tax return preparer; (8) lack of credibility of the taxpayer's testimony; (9) filing false documents, including false income tax returns; (10) failing to file tax returns; and (11) dealing in cash. Minchem Int'l, Inc. v. Commissioner, at *46. No single factor is dispositive; however, the existence of several factors "is persuasive circumstantial evidence of fraud." Vanover v. Commissioner, T.C. Memo. 2012-79, 2012 WL 952871, at *4.

On review of the facts of this case, the Court concludes that respondent has not met the burden to show that petitioner had the fraudulent intent necessary for the imposition of penalties under section 6663(a). Respondent emphasizes a number of the badges of fraud that, respondent contends, demonstrate petitioner's fraudulent intent, including its failure to report cash receipts, the claiming as business expenses of thousands of dollars in personal expenses, and Mr. Hacker's vague, misleading, or uncorroborated statements to RA Floyd. Petitioner's recordkeeping certainly left much to be desired, but the failures (loss of receipts, depositing checks in the wrong bank accounts, lack of formal agreements between petitioner and the Hackers' related entity) appear to stem more from sloppiness and a lack of sophistication than from an effort to defeat tax. And while it is true

[*55] that petitioner understated its gross receipts for 2006 and 2007, it is also true that petitioner overstated its receipts for 2004 and 2005. In addition petitioner did cooperate during the examination in that, beginning March 2008, it consented to extend respondent's time to assess tax by executing the Forms 872 for 2004 through 2007, thereby allowing time to complete the examination.

Regarding the inappropriate deductions, respondent is correct that petitioner claimed large deductions for expenses either that were personal or that lacked a demonstrated business purpose, and the Court has sustained respondent's disallowance of such deductions in large part. However, petitioner maintained a running balance, reported on its returns as "Note Receivable from Officers." The balance of the purported note increased from $236,189 at the beginning of 2004 to $1,332,006 at the end of 2007, an increase that closely tracks the credit card expenditures respondent determined to be personal expenses. Petitioner's recording and reporting of the expenses indicates an acknowledgment of their personal nature and an intention to repay or recognize as dividends the deemed distributed amounts at some point in the future, albeit an unspecified and indeterminate one.

[*56] In sum, the Court does not believe that the evidence presented rises to the level of "clear and convincing" necessary to support an imposition of section 6663(a) fraud penalties for the years at issue.

### 2. Section 6662(a) Accuracy-Related Penalties

In the alternative, respondent contends that petitioner is liable for accuracy-related penalties pursuant to section 6662(a) for the years at issue. Section 6662(a) and (b)(1) and (2) imposes an accuracy-related penalty equal to 20% of the portion of an underpayment of tax required to be shown on a tax return that is attributable to "[n]egligence or disregard of rules or regulations" or a "substantial understatement of income tax." Negligence includes "any failure to make a reasonable attempt to comply with the provisions of this title". Sec. 6662(c). In the case of a corporation, an understatement of income tax is a "substantial understatement" if it exceeds the lesser of 10% of the tax required to be shown on the return for the taxable year (or, if greater, $10,000), or $10 million. Sec. 6662(d)(1)(B).

Petitioner's only argument against imposition of the accuracy-related penalties is that respondent has not met his burden of production to show compliance with the supervisory approval requirement of section 6751(b). Petitioner's argument is misplaced. The burden of production as to penalties

[*57] remains with petitioner because section 7491(c) does not apply to corporations. See, e.g., NT, Inc. v. Commissioner, 126 T.C. 191, 195 (2006). The Court has previously held that the Commissioner does not bear the burden of production as to the supervisory approval requirement under section 6751(b) for a penalty determined against a corporation. Dynamo Holdings Ltd. P'ship v. Commissioner, 150 T.C. 224, 231-232 (2018).

Although respondent does not bear the burden of production with respect to penalties asserted against nonindividual taxpayers, such taxpayers may raise the lack of supervisory approval as an affirmative defense to penalties. See Palmolive Bldg. Inv'rs, LLC v. Commissioner, 152 T.C. 75, 83 (2019); Endeavor Partners Fund v. Commissioner, T.C. Memo. 2018-96, at *63-*64, aff'd, 943 F.3d 464 (D.C. Cir. 2019). Petitioner raised the question of supervisory approval for the first time on brief. It did not raise the affirmative defense in its pleadings, as required under Rule 39, nor has it sought leave to amend its pleadings pursuant to Rule 41.

Moreover, respondent has introduced into evidence a copy of the answer in this case, signed on April 4, 2012, by the immediate supervisor of respondent's

[*58] counsel.[11]  See Koh v. Commissioner, T.C. Memo. 2020-77, at *5-*6 (concluding that respondent's counsel may make the initial penalty determination for purposes of section 6751(b)(1) in an answer).  The answer reflects respondent's assertion of the accuracy-related penalties under section 6662(a) for negligence and substantial understatements of income tax.  There is no evidence in the record to suggest, and petitioner does not allege, that respondent communicated his initial penalty determination to petitioner before the date represented in the answer.  See Clay v. Commissioner, 152 T.C. 223, 249 (2019), aff'd, 990 F.3d 1296 (11th Cir. 2021).

Petitioner does not raise any other challenges to the penalties.  The frequency, nature, and pervasiveness of the adjustments giving rise to the deficiency in this case leave little question that petitioner disregarded the rules and regulations and failed to make a reasonable attempt to comply with the Code.  Petitioner does not argue, and the record does not show, that petitioner had

---

[11]On October 6, 2017, respondent filed a motion to reopen the record to submit additional evidence.  Attached to the motion was, among other documents, the declaration of Elizabeth Downs, the immediate supervisor of respondent's counsel in this case, and a copy of respondent's answer, signed by Ms. Downs and approving the assertion of the penalties at issue herein.  The Court granted respondent's motion by order dated July 1, 2021.

[*59] reasonable cause for its underpayments.  Accordingly, the accuracy-related penalties are sustained.

IX.   Conclusion

Petitioner is liable for deficiencies for 2004, 2005, 2006, and 2007 to the extent discussed herein.  Respondent's determinations of accuracy-related penalties for all years and an addition to tax for 2007 are sustained.  The Court has considered all of the arguments made by the parties and to the extent they are not addressed herein, they are considered unnecessary, moot, irrelevant, or otherwise without merit.

To reflect the foregoing,

Decision will be entered under

Rule 155 in docket No. 3868-12.